353 A.2d 190.

STATE *vs.* LEONARD C. JEFFERSON.

MARCH 10, 1976.

PRESENT: Paolino, Acting C. J., Joslin, Kelleher and Doris, JJ.

KELLEHER, J.  At 7:46 p.m. on December 7, 1973, a unit of the Providence Fire Department's Rescue Squad responded to a call for assistance originating from an apartment house located at 24 Arch Street.  When the squad members entered the premises, they found a bloody and unconscious elderly man lying in the hallway at the foot of a flight of stairs leading to the second floor.  They transported him to St. Joseph's Hospital where he died.  The deceased, Virginio DeFusco, owned the apartment house.

Subsequently, defendant, one of DeFusco's tenants, was arrested, indicted and tried before a Superior Court jury for the robbery and the murder of his 79-year-old landlord. The trial justice granted defendant's motion for a judgment of acquittal on the robbery charge. The jury, however, found that Jefferson had killed DeFusco during the course of an attempted robbery which under G. L. 1956 (1969 Reenactment) §11-23-1 constitutes first degree murder. The trial justice imposed the mandatory life sentence and defendant has appealed.

There are three facets to Jefferson's appeal. Two involve the trial justice's denial of defendant's motion for a judgment of acquittal and the denial of a motion for a new trial. The remaining objection concerns certain remarks made by the prosecutor during his argument.

Before an assessment can be made of the correctness of the denial of the acquittal and new trial motions, it is necessary that we give a brief resume of some of the evidence adduced at trial.

Jefferson lived on the second floor of the Arch Street building, occupying apartment number 3. Jefferson's next door neighbors were David Jones and his common-law wife, Pearl. They resided in apartment number 2. Pearl's brother, Ernest L. Hawkins, and his girlfriend lived in apartment number 1. During the afternoon of December 7, Jefferson spent several hours in apartment 2 where he helped Jones consume several pints of whiskey. In between sips, Jefferson told Jones that he was "going to rip the landlord off." Sometime after imparting this information, Jefferson left Jones' apartment. Jones testified that he fell asleep shortly thereafter but was awakened by the sound of a scuffling or stomping going on in the hallway. Jones left his apartment and when he peered down the stairway, he saw Jefferson in the front hall kicking the landlord's inert body. Shocked, he quickly retreated to

his apartment. Conscience or curiosity, however, apparently got the best of him because he returned to the hallway for a second look. This time, he saw Jefferson standing over the body looking through some papers. Jefferson beckoned Jones to come downstairs and he complied. Jefferson then gave him a $20 bill and told him to keep his mouth shut. Shortly thereafter, Jones and Jefferson left the premises and went to an Elmwood Avenue liquor store where they purchased some whiskey and other alcoholic beverages.

Pearl told the jury that when she came out into the hallway that evening to bring in her cat, she saw her landlord's badly beaten body lying at the bottom of the stairs in a pool of blood and Jefferson standing on the stairway just three steps away. Pearl called the rescue squad. Her brother, Ernest Hawkins, testified that about an hour earlier, 6 p.m. roughly, he had gone into the hallway and turned on the lights near a stairway that led to the third floor's communal bathroom. As soon as he flipped the switch, Jefferson appeared and extinguished the lights, telling Hawkins that he wanted everything quiet because he had "something going."

An Associate Medical Examiner told the jury that the autopsy revealed that the landlord's death was attributable to a brain hemorrhage which was caused by "blunt trauma." He stated that the head injuries were consistent with those caused by use of kicks or punches. Coincidentally Jefferson complained of a painfully swollen right hand shortly after his arrest. He was taken to the Rhode Island Hospital and x-rays disclosed a fracture. A picture of this grossly distorted appendage was placed in evidence. Jefferson told the police that he had sustained the injury at work.

A specialist assigned to the Providence Police Department's Bureau of Criminal Identification reported that a

benzidine test conducted several hours after Jefferson's arrest indicated the presence of a "medium amount" of blood on his hands.

Finally, the prosecution presented an expert witness who was an agent of the Federal Bureau of Investigation, whose specialty was the microscopic examination of hairs, fibers and textile materials. The agent had made a comparison between certain scrapings taken from beneath four of Jefferson's fingernails and the fibers found in the woolen suit coat worn by the landlord at the time he was assaulted. The coat, introduced as an exhibit, has a subtle fabric pattern comprised of seven different colored fibers. The scrapings contained fragmented fibers identical to certain fibers found in the landlord's coat. The special agent opined that the fragments either came from the landlord's coat or some other material having the identical microscopic characteristics as the fibers found therein. He added that these fragments could not have been embedded under the fingernails by a mere casual touching; the contact which impacted this substance had to be "substantial."

The special agent also made a microscopic examination of a group of textile fibers that had been removed from a shirt which the Providence police had seized during a search of Jefferson's apartment. The agent testified that fibers lodged on this shirt and the sample fibers from the deceased's jacket were alike.

The defendant's motion for a judgment of acquittal was presented at the conclusion of all the testimony. When such a motion is made, the trial justice's review of the evidence is restricted to an evaluation of that evidence which the state claims affords the requisite basis for submitting the case to the jury. The trial justice is bound to review this evidence, excluding the remainder, in a light most favorable to the state, drawing therefrom all reasonable inferences consistent with guilt. Neither the credi-

bility of witnesses nor the weight of the evidence is before the court at that time. *State* v. *Wilbur,* 115 R. I. 7, 15-16, 339 A.2d 730, 735 (1975); *State* v. *Crescenzo,* 114 R. I. 242, 256, 332 A.2d 421, 429-30 (1975).

Jefferson, in arguing that the trial justice erred by denying his acquittal motion, claims that the evidence pointing to his guilt is overwhelmingly circumstantial, supporting an inference of guilt, but failing to exclude the equally reasonable inference that he neither killed nor attempted to rob DeFusco. We cannot agree with this contention.

The so-called circumstantial evidence rule, relied on by Jefferson, requires a finding of not guilty only on the showing of a *reasonable* hypothesis of innocence,[1] not a *possible* hypothesis of innocence. Even assuming that the rule is applicable in this case, it only measures the evidence which the state contends is capable of generating a finding of guilt beyond a reasonable doubt.

Looking at the evidence relied upon by the prosecutor, several critical facts emerge: (1) Jefferson's admission to his next door neighbor and drinking companion, Jones, that he was going to rip off the landlord, (2) the Hawkins lighting dilemma, when Jefferson turned off the power because he had "something going," (3) the neighbors' attention to the scuffling in the hallway, (4) the witnessing of Jefferson at the bottom of the stairway kicking the

---

[1] This rule, which we have referred to on innumerable occasions, provides that when a case against an accused is based solely on circumstantial evidence, a finding of guilt can only be made if the facts and the circumstances which establish guilt are not only consistent with the hypothesis that the accused is guilty, but that they also preclude the drawing of any reasonable hypothesis that he is innocent. *State* v. *Murphy,* 113 R. I. 565, 593, 323 A.2d 561, 565 (1974). Even though the circumstantial evidence rule is still recognized in this jurisdiction it does not require the jury to search out a series of speculative theories of innocence and elevate them to a status of a reasonable doubt. *See People* v. *Sullivan,* 22 Ill.2d 122, 174 N.E.2d 860 (1961), citing *People* v. *Russell,* 17 Ill.2d 328, 331, 161 N.E.2d 309, 311 (1957).

landlord and going through his papers, and (5) defendant's gift to Jones of a $20 bill accompanied by the instructions to keep quiet. Viewing the reasonable inferences from both these facts and the scientific findings by the municipal and federal authorities in a light most favorable to the prosecution, there was ample evidence to enable the jury to find that Jefferson had murdered his landlord while attempting to rob him. Although defendant has offered numerous potential explanations compatible with his innocence, none of them support an inference that reasonably flows from the evidence which the state claims and which, in fact, does support the denial of his motion for a judgment of acquittal.

In passing upon Jefferson's motion for a new trial, the trial justice reviewed and commented on the evidence which was relevant to the felony murder charge. He spoke of the rip off boast, the scuffling in the hallway, Jones' eyewitness account of defendant stomping and subsequent rummaging through the landlord's papers and Pearl placing Jefferson in the vicinity of the body. Moreover, the trial justice thought defendant's broken hand and the agent's testimony to be especially significant.

A defendant, who seeks to prevail on the contention that the trial justice erred in denying his motion for a new trial, must persuade us that he was either clearly wrong or that, in reviewing the evidence, he overlooked or misconceived material evidence on a controlling issue. *State* v. *Howard*, 114 R. I. 731, 738, 339 A.2d 259, 263 (1975); *State* v. *Lima*, 113 R. I. 6, 8, 316 A.2d 501, 502-03 (1974); *State* v. *Wiggin*, 106 R. I. 69, 73, 256 A.2d 219, 221 (1969). In seeking to discharge this burden, Jefferson contends that the trial justice misconceived the thrust of the special agent's testimony. This expert, who identified himself as a "microscopist," told the court and jury that he had used a comparison microscope to examine and com-

pare several slides containing fragments of the woolen fibers found under Jefferson's fingernails with others containing a representative sampling of fibers from the landlord's coat. The comparison miscroscope is a double barrelled instrument whose optical devices allow the expert to simultaneously view and compare the fragments on one slide with the coat's fibers on the other. The expert said he was able to identify from the fragments he examined, the presence of three of the colors used in the coat's fabric. He also testified that these fragments and the test fibers were identical with respect to certain microscopic characteristics: dye strength, color, texture and the prominence of scales along the exterior of each fiber. While the expert would not categorically state that the fragments came from the coat, he was emphatic that the fragments either came from that garment or some other source of wool fibers that possessed the same microscopic characteristics as the coat's fibers. The agent informed the jury that the fibers removed from Jefferson's shirt were identical to the coat's fibers and that he found all seven colors which make up the pattern of the coat in the fibers that had adhered to the shirt. This witness also said that woolen fibers vary considerably with respect to texture, scale contour and strength of the dye.

The defendant argues that the trial justice prejudicially misconceived the expert testimony when denying the new trial motion by allegedly stating that the fragments and test fibers taken from the deceased's jacket had to come from the same bolt of fabric. Our examination of the transcript indicates that neither the expert nor the trial justice made such a statement.

The expert, in response to a question posed by the trial justice, stated that even if the fibers of several jackets, manufactured from the same bolt, were sufficiently similar to the fragments from Jefferson's fingernails, he still could

not state unequivocally which garment the fibers origi-
nated from. The expert attributed his lack of certainty
to the possibility that more than one bolt of cloth was
cut from the run of fabric which was spun off the loom.
Perplexed, the trial justice asked: "But you would be able
to determine that the * * * fibers found in the scrapings
did come from the same bolt which resulted in the manu-
facture of the five jackets?" The witness disagreed, ex-
plaining that the possibility that more than one bolt was
taken from the run[2] of the woolen fabric precluded the
identification of the specific bolt. Satisfied with the expla-
nation, the justice stated: "I understand."

Jefferson, preceding the time of his arrest, had worked
in a North Providence textile mill that manufactures wool
and synthetic fabrics. He began work on Tuesday, No-
vember 27, 1973, and voluntarily terminated his employ-
ment on December 6. One of his jobs as a "technician
trainee" was to assist in the maintenance of machinery
such as the looms. The defense contended that the finger-
nail fragments could have come from the mill rather than
the deceased's jacket.

The trial justice rejected this contention because it
necessitated the adoption of a sequence of tenuous assump-
tions: (1) the North Providence textile mill produced a
continuous run of the exact woolen fabric used to make
the decedent's jacket, (2) defendant handled, with suffi-
cient vigor, this particular fabric, (3) the fabric was
shipped thereafter to the manufacturer, who mass pro-
duced suits which were locally merchanized under the
Hallmark label, (4) the victim purchased one of these

---

[2] A run is a batch or lot of material that is processed in a single con-
tinuous operation. A bolt is the term used to designate a length of
cloth as it is sold. A bolt may consist of as much as 100 yards of
material. The Modern Textile and Apparel Dictionary (4th rev. ed. 1973).
A bolt is cut from the run of material.

suits, and (5) all of the preceding events transpired within the 2-week period[3] of Jefferson's employment at the mill. Attempting to knit these assumptions together, the judge was faced with a patchwork of independently improbable events connected only by the threads of hope sown by diligent advocacy. The chance that such a chain of events could and did occur was characterized by the trial justice as "miniscule" and "improbable." We cannot fault his conclusion.

Failing to uncover any material misconception of evidence, we turn to defendant's contention that he is entitled to a new trial. He claims that his due process rights were violated since his conviction was allowed to rest upon testimony by individuals described by the trial justice as perjurers. We must place this facet of Jefferson's appeal in proper perspective by illuminating certain salient facts.

First, it should be noted that Jones was under indictment at trial time for aiding and abetting Jefferson during the robbery and for harboring him after the homicide. Second, the "microscopist" had informed the jury that a study of the scrapings taken from beneath Jones' fingernails indicated a similarity between the scrapings and the fibers found in the decedent's coat. Moreover, the fibers found on the shirt Jones was wearing on the day of the homicide were identical to the test fibers taken from the coat. Although Jones conceded at trial that the charges pending against him were going to be dropped by the Attorney General's department because of a lack of evidence, the trial justice in his charge specifically told the

---

[3]Jefferson's association with the mill was limited to a 10-day period, November 27, 1973, to December 6, 1973. The payroll records of the mill indicate that Jefferson worked 40 hours during the week which contained the last days of November and 29¾ hours in the week that began Monday, December 3. However, there is nothing in the record to indicate whether the mill was working on a 5, 6, or 7 days a week cycle.

jury it was free to determine whether Jones' credibility was in any way affected by the prosecutor's promise.[4]

Jones' wife, Pearl, made two appearances on the witness stand, one each for the prosecution and the defense. When she first took the stand, she claimed that her husband had gone out into the hall at some point in the evening and told her to summon help. When she appeared for the defense, however, Pearl told the jury that her husband slept during the entire episode. Moreover, when Pearl's brother Ernest testified for the state, he described his brother-in-law as being "conked out" on the couch. Therefore, both witnesses attempted to give the impression that Jones never ventured out into the hallway to see what was causing all the noise. The trial justice characterized the testimony of Jones, Pearl and Ernest as being to some degree clearly perjurious. Additionally, he offered his opinion that Jones was able to tell what actually transpired on the first floor because he was alongside Jefferson during the beating, not on the second floor acting as an observer. The trial justice suspected that the three witnesses were attempting to assure Jones' future freedom by painting a verbal portrait depicting him in his room fast asleep and far from the punching, kicking and shouting which was taking place on the first floor landing.

These conclusions were well within the justice's province because when deciding a motion for a new trial, he acts as a "super juror or a thirteenth juror" who must make an independent appraisal of the evidence in the light of his charge to the jury. When sifting the evidence, he can reject some by moving it "out" and accept other evidence by moving it "in." He can draw inferences which might have escaped the jury's scrutiny so long as they are reasonable in view of the evidence in the record. *Ruggieri* v.

---

[4]After the trial, the charges pending against Jones were dropped.

*Big G Supermarkets, Inc.*, 114 R. I. 211, 215-16, 330 A.2d 810, 812 (1975); *Gordon* v. *Campanella Corp.*, 112 R. I. 417, 420, 311 A.2d 844, 847 (1973); *Ruggieri* v. *Beauregard*, 110 R. I. 197, 199, 291 A.2d 413, 414 (1972); *Barbato* v. *Epstein*, 97 R. I. 191, 193, 196 A.2d 836, 837 (1964).

Jefferson seeks to support his due process argument by citing a line of cases where convictions were set aside because of the prosecutor's knowing use of perjured testimony. Here, however, the perjury accusation is not directed at the prosecutor nor does it relate to Jefferson's participation in the homicide. The alleged falsehoods concern *Jones'* not *Jefferson's* whereabouts while the stomping and the scuffling were in progress. Consequently, the cases cited by Jefferson are totally inapposite.

We see no reason to fault the trial justice's denial of a new trial.

Finally, we come to the allegedly prejudicial prosecutorial comments. When Jones was being cross-examined, he conceded that he had a lifetime habit of consuming approximately three pints of whiskey a day, yet he insisted that on the day of the homicide, he was in full command of his faculties. Jones also told defense counsel that he had worked on December 6, the day before the hallway hassle, for a firm which specialized in the furnishing of part-time help. However, as part of its case, the defense presented Jones' employment records which indicated that the last time he had worked was the previous July. In his closing argument, the prosecutor made reference to this impeachment testimony by stating:

> "* * * I submit to you Ladies and Gentlemen of the Jury, besides the direct testimony of the witnesses, you have got additional evidence to make your decision on. Again, the defense wants you to think that Jones was the — he was the bum that wasn't working, and he was working that day, and that's the reasonable doubt. I submit everything they want you

to believe is speculation. I submit the positive evidence we have produced has not been explained to you and could have been."

The defense counsel immediately objected and a bench conference ensued. When the conference concluded, the judge informed the jurors to view the prosecutor's comments as being directed at the testimony given on behalf of defendant with the specific understanding that Jefferson was not obligated to explain anything at all to anyone. Moreover, the judge stated, "[t]he defendant has an absolute right to demand that the State prove its case." The prosecutor responded to these instructions by attempting to explain his earlier statement. He exclaimed:

"* * * what I'm suggesting is that there are many people that could say, 'I noticed the swollen hand before the time of the murder.' We know from the testimony that he was living with a woman — — "

Again the defense counsel immediately objected and the trial justice gave an instantaneous response by informing the jurors that the comment was improper and again reminding them that defendant was not obligated to produce evidence. Moreover, he instructed them to concern themselves with the evidence defendant had produced not with what he may have or could have produced.

Jefferson contends that the observations made by the prosecutor constitute unconstitutional comments because they reminded the jury of his testimonial silence and thereby violated the ruling in *Griffin* v. *California*, 380 U. S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), as well as our recent holding in *State* v. *Sherman*, 113 R. I. 77, 317 A.2d 445 (1974). *Griffin* and *Sherman* stand for the proposition that the fifth amendment protection against incrimination bars a prosecutor or a judge from making any adverse comment on the accused's failure to testify in his own behalf. In *Sherman*, we ruled that once such a com-

ment is made, the trial justice must immediately inform the jury, in clear and concise terms, that it cannot draw any adverse inference from the accused's failure to appear as a witness in his own behalf. *Id.* at 81-82, 317 A.2d at 448. In order that there be a violation of *Griffin*, it must appear that the language used by the prosecutor "* * * was manifestly intended or was of such character that the jury would naturally and necessarily construe it to amount to a comment on the failure of the accused to testify." *State* v. *Fontaine,* 113 R. I. 557, 563, 323 A.2d 571, 574 (1974). However, we have also recognized that while the defense is under no obligation to present evidence, the prosecution may make proper comment on the evidence which the defense has brought into the record. *State* v. *Summerour,* 107 R. I. 42, 46, 264 A.2d 329, 331 (1970).

Several factors can be considered in determining whether a particular statement falls within the ambit of *Griffin*: (1) was the comment directed specifically to the defendant's failure to take the stand or to the quality of evidence presented by the defense; (2) did the trial justice, after objection was made, give a proper cautionary instruction; (3) were the prosecutorial comments aggravated or repetitive; (4) was the defendant the only person who could refute the evidence which would thereby cause the comment to be directly pointed at the accused. *See People* v. *Todd, Colo.,* 538 P.2d 433, 436 (1975). Apart from any consideration of these factors, any time a prosecutor stresses the defense's failure to present testimony, he is engaging in a type of brinkmanship that could cause a reversal and a retrial.

At first blush, the prosecutor's reference to the "positive" "unexplained" testimony presented by the state appears to be ambiguous. Fortunately, the stenographer who recorded the proceedings in the Superior Court has fur-

nished us with a transcript of the prosecutor's argument. After a careful reading, it is clear what evidence comprised the "positive evidence" which he claimed defendant had not explained.

In his argument, the prosecutor conceded that Jones, Pearl and Ernest lived in a culture that might seem strange indeed to the average juror, but he went on to point out that it was the obligation of the Attorney General's department to prove its case with "the evidence that we have and the witnesses that we have." For the purposes of argument, he agreed that the trio's testimony was "too unreliable" to place Jefferson near the murder scene. However, the prosecutor then referred the jury to the objective evidence gathered by the police: the positive results from the benzidine test, the comparison between the fingernail fragments and shirt fibers with the test fibers from the decedent's coat, and, finally, the picture of Jefferson's broken hand. Pointing to these three evidentiary facts, the prosecutor stressed the effort made by the defense to explain them. He emphasized that none of the mill personnel who testified offered any testimony that the blood or the injured hand were work related. He agreed that the mill manufactured woolen fabric, but pointed out that none of the mill witnesses testified that the fabric was being manufactured for and distributed by the makers of Hallmark suits.

The prosecutor acknowledged the defense's argument that Jefferson never told his supervisor about his injury because he wanted to impress his employer, but countered this theory by remarking that Jefferson's hand was broken not bruised, an injury consistent with the beating of the decedent. It is clear therefore that the prosecutor's remarks were fair comment on the evidentiary shortcomings of the defense presented by Jefferson and fall within the *Summerour* rule.

While there is support for a rule that a jury can consider a defendant's unexplained failure to present a witness who, if the defense is genuine, might be expected to corroborate that defense,[5] we believe a better rule was adopted by the court in *State* v. *Caron,* 300 Minn. 123, 218 N.W.2d 197 (1974). There the Minnesota Supreme Court declared that "a prosecutor may not comment on a defendant's failure to call witnesses." *Id.* at 127, 218 N.W.2d at 200. The court stated two reasons for its ruling: "First, such comment might suggest to the jury that defendant has some duty to produce witnesses or that he bears some burden of proof; second, the comment might erroneously suggest to the jury that defendant did not call the witnesses because he knew their testimony would be unfavorable."

In this jurisdiction, we have recognized the so-called "empty chair doctrine" which holds that a litigant's failure to produce an available witness who might be expected to testify in support of the litigant's case, permits the factfinder to draw the inference that had the witness chair been occupied, the witness would have testified adversely to the litigant. Nevertheless, we have in recent times recognized that this doctrine should be applied with care and that before a jury can be charged in this regard, there must be a showing of the witness' availability and the party seeking the benefit of the inference must inform the trial justice that he will ask for appropriate instructions. *McAree* v. *Gerber Products Co.,* 115 R. I. 243, 258-59, n.6, 342 A.2d 608, 616 n.6 (1975), citing *Anderson* v. *Friendship Auto Body & Radiator Works, Inc.,* 112 R. I. 445, 311 A.2d 288 (1973); *Benevides* v. *Canario,* 111 R. I. 204, 301 A.2d 75 (1973).

Our past concern with the application of this rule is evident. We now believe that the Minnesota court's con-

---

[5]*State* v. *Bey,* 342 A.2d 292, 298 (Me. 1975).

cern about the jury's possible mistaken belief that a defendant has a duty to prove his innocence is well taken. Consequently, we find that the prosecutor's reference to Jefferson's failure to produce his wife or girlfriend was improper. Notwithstanding his remark, any harm caused by the prosecutor was cured by the timely and effective instructions given by the trial justice. *State* v. *Pailin,* 114 R. I. 725, 339 A.2d 253 (1975).

The defendant's appeal is denied and dismissed.

Mr. Chief Justice Roberts did not participate.

*Julius C. Michaelson,* Attorney General, *William Granfield Brody,* Special Asst. Attorney General, *John Austin Murphy,* Special Asst. Attorney General, for plaintiff.

*William F. Reilly,* Public Defender, *Bruce G. Pollock,* Asst. Public Defender, for defendant.