STATE

v.

James T. McASSEY.

No. 80–102–C.A.

Supreme Court of Rhode Island.

July 22, 1981.

Dennis J. Roberts, II, Atty. Gen., Maureen E. McKenna, Asst. Atty. Gen., for plaintiff.

Lavine, Sutherland & DiGianfilippo, Ltd., Joseph DiGianfilippo, Woonsocket, for defendant.

## OPINION

KELLEHER, Justice.

The defendant, James T. McAssey (McAssey), was convicted by a jury in the Superior Court of operating a motor vehicle in reckless disregard of the safety of others, with death resulting, in violation of G.L. 1956 (1968 Reenactment) § 31–27–1. The sole issue presented by this appeal is whether the evidence adduced at trial was sufficient to warrant a finding of reckless conduct.[1]

The record reveals that on May 3, 1979, at approximately 7 p. m., McAssey was driving a loaded tractor-trailer rig along Route 146

---

1. General Laws 1956 (1968 Reenactment) § 31–27–1, as amended by P.L. 1978, ch. 208, § 2, provides:

   "(a) When the death of any person ensues as a proximate result of an injury received by the operation of any vehicle in reckless disre- gard of the safety of others, the person so operating such vehicle shall be guilty of 'driv- ing so as to endanger, resulting in death.'
   "(b) Any person charged with the commis- sion of the foregoing shall upon conviction be imprisoned for not more than ten (10) years."

in a northerly direction. At an intersection in North Smithfield, McAssey struck a vehicle that was traveling across the roadway in a westerly direction. The driver of that vehicle, Thomas Leath, died as a result of injuries sustained during the collision. In an effort to prove that McAssey had been driving recklessly, the state produced two witnesses who testified that when McAssey entered the intersection, the traffic signal controlling the flow of traffic in his lane was red.

In May 1979 this particular intersection presented an intriguing traffic pattern. For the major portion of its length, Route 146 was (and still is) a four-lane highway. Two lanes, one for travel and one for passing, served the northbound traffic, whereas the other two lanes served in a similar capacity for the southbound motorists. However, at the intersection in question the highway had sometime before been expanded into six lanes, with each lane controlled by a separate set of lights. The two additional lanes were called "U-turn" lanes. Somewhere south of the stop line but immediately east of the northbound travel lane, the state had built a divider that, according to one witness, was composed of macadam and curbing. The northbound motorist who wished to use the U-turn lane would bear to the right of the divider and stop at the intersection, faced by a red light that controlled the traffic in that lane. A tripper in the U-turn lane would activate the lights controlling traffic in the northbound and southbound travel and passing lanes, and the lights controlling traffic in each of those lanes would go from green to yellow to red. At that point, the motorist in one U-turn lane could turn left and travel in a direction perpendicular to the northbound lanes, and then either the motorist could continue in the perpendicular plane across the southbound lanes into the entrance of the Rustic Drive-in Theater or he or she could make a true U-turn and proceed in a southerly direction. A motorist in the other

U-turn lane could travel easterly across the southbound lanes and then turn northerly and head toward Woonsocket. There was[2] a metal guardrail that, except for the immediate area of the intersection, ran on both sides of the intersection along an island in the center of Route 146 and served as a barrier separating northbound and southbound traffic.

Annette Lussier testified that she was traveling in the northbound passing lane, slightly ahead of the McAssey vehicle, as they both approached the drive-in intersection. She stated that some 150 feet from the intersection, the light changed from yellow to red. According to Ms. Lussier, it was at this point that she moved into the right-hand lane, allowing the rig to pass her. She estimated her speed to be between 45 and 50 miles an hour. She added that the truck went through the red light, hit the Leath vehicle, swerved to the left of the guardrail into the southbound lane, sideswiped a second motor vehicle that was proceeding in the southbound travel lane, and ended up alongside the rail facing north in the southbound passing lane of Route 146 two hundred feet north of the intersection. When asked if the rig was going faster than her Buick Skylark when the rig approached from the rear, Ms. Lussier answered in the affirmative, pointing out that she had turned to her right because "it [the rig] was right behind me to let me know."

A pedestrian who had been walking in a southerly direction along the easterly side of Route 146 generally corroborated Annette's version of the events giving rise to the fatality. John Malisz (Malisz) stated that when he walked by the Leath vehicle, it was stopped at the light, preparing to cross the intersection. Malisz testified that Leath had on his directional signal and had waited for a green light before he began to move into the intersection. He added that the light in the northbound lane was red

---

2. Our use of the past tense is intentional. Sometime subsequent to the May 3, 1979 collision, the Department of Transportation closed off the Rustic Drive-in Theater intersection by making the guardrail and its island one continuous structure and removing the U-turn trippers and the traffic controls.

when McAssey passed through the intersection and hit the Leath vehicle. Malisz reported that he first observed the tractor-trailer rig when he was twenty feet north of the traffic lights. He estimated the distance between him and the rig at that point to be 300 feet. To put it another way, according to Malisz, at the time of his initial observation, McAssey was 280 feet south of the intersection. At no time did either Ms. Lussier or Malisz hear the rig sound its air horn as it entered the intersection. Malisz told the jury he "could sense something was going to happen," and when asked why, he said "[b]ecause when the truck was coming he wasn't slowing down." Malisz also reported that anyone who was standing at the Rustic intersection and watching the approach of the northbound traffic would be able to see a distance of "half a mile or more."

The police officer who initially reported to the collision scene testified that as one approached the Rustic interchange, the speed limit dropped from 55 to 45 miles per hour. McAssey took the stand in his own defense. He maintained that the light for northbound traffic was green when he entered the intersection, and he estimated his speed to have been between 45 and 55 miles per hour.

After the jury returned a verdict of guilty, McAssey moved for a new trial, asserting that the evidence presented by the state did not establish that his driving techniques on the evening in question amounted to a reckless disregard of the safety of the other motorists who were traveling along Route 146. The trial justice denied the motion, stating that as the "13th juror" he found the testimony of the state's witnesses to be credible and that such testimony was sufficient to sustain the jury's finding.

McAssey faults the trial justice's consideration of his new-trial motion as a misconception of "pertinent evidence" and describes the jury's verdict as "contrary to the clear weight of the evidence." He claims that even if we were to disregard his testimony and focus our attention solely on the evidence produced by the prosecution, he had but "two seconds" [3] to bring his rig to a halt before contact was made with the U-turn vehicle. Thus, he claims, his decision to proceed through the intersection, although it might be considered negligence at best, never rises to the level of recklessness. As will be seen, McAssey's conclusion is based on a faulty premise because neither the jury nor the trial justice nor we can ignore his testimony.

McAssey seems to forget that his challenge to the sufficiency of the evidence comes by way of a motion for a new trial rather than a motion for judgment of acquittal. When a trial justice considers a motion for judgment of acquittal, the credibility of the witnesses and the weight of the evidence are not in issue because the court is required to consider the evidence in the light most favorable to the state, drawing therefrom all reasonable inferences consistent with guilt. *State v. Benevides*, R.I., 425 A.2d 77 (1981); *In re Vincent*, R.I., 413 A.2d 78 (1980); *State v. Smith*, R.I., 401 A.2d 41 (1979). However, when a defendant challenges the sufficiency of the evidence via a motion for a new trial, the trial justice does weigh the evidence, assess the credibility of witnesses, and consider the evidence in the light of the charge given to the jury. *State v. Roddy*, R.I., 401 A.2d 23 (1979); *State v. Jefferson*, 116 R.I. 124, 353 A.2d 190 (1976). When a defendant makes no objection to the charge, the charge as given becomes the law of the case. *State v. Giordano*, R.I., 413 A.2d 93 (1980); *State v. Grullon*, 117 R.I.

**3.** In taking the two-second approach, McAssey might have had in mind page 10 of the Driver's Manual, a publication prepared and published by the state's Registry of Motor Vehicles in which can be found a chart which indicates that a motorist who is proceeding at 50 miles per hour and is called upon to stop his or her automobile will travel 188 feet before the vehicle comes to a halt. The reaction time before the motorist begins to apply the brake is three-fourths of a second, and during this brief interval the vehicle has traveled 55 of those 188 feet. The manual also points out that the force of impact generated by an automobile proceeding at 40 miles an hour at the time of the collision is four times that of an automobile traveling at 20 miles an hour.

682, 371 A.2d 265 (1977). Here, McAssey made no objections to the charge, and we, like the trial justice, must consider the evidence adduced in the light of that charge.

In his charge, the trial justice told the jury that since McAssey was charged with operating a motor vehicle "in reckless disregard of the safety of others," the issue to be resolved was not whether McAssey was negligent or careless. The term "reckless" as used in the statute, he said, meant a willful or wanton disregard of the safety of others by McAssey. According to the trial justice, the factual issue to be resolved was whether McAssey's driving was a conscious and intentional driving in that

> "the defendant knew, or the defendant should have known that his manner of driving created an unreasonable risk of harm to others upon the highway, even though he had no actual intent to cause harm to anyone on the highway. Risk—now, what that means is this. If you drive an automobile upon the highway of this state in such a manner that you should know that your manner of driving can result in harm to others, that can be considered as intentional or wilful conduct on your part, even though you may have had no intention whatsoever of hurting anyone on the highways. That is the law." [4]

As a guide for appraising McAssey's conduct, the jury was told it could take into consideration such factors as the prevailing weather conditions at the time of the collision, the manner and nature of the intersection, the available traffic controls, and the speed or lack of speed of the rig, having in mind the circumstances of the collision.

When McAssey, a lifelong resident of Woonsocket, testified in direct examination, he told the jury that he had been driving tractor-trailer rigs for approximately fourteen years. For seven years prior to trial, he would leave his employer's Woonsocket terminal at the start of the work day and drive southerly along Route 146. At the end of the day's work, he would return to Woonsocket to the terminal and home by way of Route 146.

On the evening in question, he was proceeding to Woonsocket from his last stop in Warren, Rhode Island. Once McAssey came to the crest of a hill which was situated just north of an Interstate Route 295 exit ramp, he said he could see "the whole highway from then on on the way down." Included in his line of sight was the Rustic traffic signal. He said he was keeping an eye on the car in the U-turn lane but "glanced up at the traffic ahead for the next light because I knew I would have to stop there." He then insisted that when he looked at the Rustic light, "It was green." As he passed the Lussier car, the U-turn vehicle "came right across the highway." According to McAssey, he applied his brakes and, contrary to the earlier testimony, he also sounded his air horn, but all of this went for naught. He impaled the Leath car on the median guard strip and, as noted earlier, sideswiped a second vehicle and finally came to a halt in the southbound passing lane some distance north of the Rustic intersection. He estimated his precollision speed as being a little better than 45 miles per hour.

4. While the trial justice quite properly framed the issue to be resolved by the jury as whether it believed the evidence indicated McAssey knew or should have known that his conduct created an unreasonable risk of injury to other motorists, he beclouded the issue when in defining "risk," he spoke in terms of "should know," a foreseeability standard which is usually used to measure simple negligence. Our reckless-homicide statute represents a legislative effort to fashion a suitable criminal sanction to deal with death caused by conduct which the General Assembly believed sufficiently blameworthy to merit a prison sentence which can range up to ten years.

"[R]eckless disregard of the safety of another" is described in 2 Restatement (Second) Torts § 500 at 587 (1965), as conduct in the doing or the failure to do an act "which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." Prosser has described " 'wilful,' 'wanton' or 'reckless' conduct" as "highly unreasonable conduct, or an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." Prosser, Torts § 34 at 185 (4th ed. 1971).

On cross-examination, McAssey reported that his rig, consisting of a tractor and an empty trailer, weighed ten tons, and he estimated that the cargo on board the forty-foot-long trailer at the time of the collision weighed four tons. When asked what plans he had had for the evening of May 3, 1979, McAssey said he had planned to pick up his son, who was playing baseball at Woonsocket's Cold Spring Park. The ball game usually began at 6 p.m. and ended two hours later. The pickup was scheduled to occur after McAssey had returned to his employer's terminal and finished his chores for the day. When asked if it was fair to say that he would have liked to have arrived at the park in time to have seen his son perform, McAssey conceded that most parents would share such a goal but insisted that, parental pride to one side, he had been in no hurry to touch bases with the terminal and his favorite ball player.

McAssey, after comparing the rig's five-speed transmission with the three-speed transmission usually found in a passenger car, conceded that when he was to the rear of the Lussier vehicle, he was in fourth speed, or the rig's second highest gear. When the rig was in fourth gear, he explained, the speed could vary anywhere from 45 to 50 miles an hour.

The second set of lights referred to by McAssey was to be found at an intersection which was located next beyond the Rustic interchange. The roadway sloped upward toward the second intersection. In rejecting the prosecutrix's suggestion that he had ignored the red light so that he would only have had to have made one stop, specifically, the one at the intersection above, McAssey insisted that this possibility was of no concern because he had had the green light at the Rustic intersection. There is no dispute but that at the time of the collision visibility was good and the roadbed was dry.

In denying the new-trial motion, the trial justice stated that McAssey's attempt to portray himself as one who "was in no great hurry getting home" and as one who had the right of way must be termed "incredible" and "false." On the other hand, the trial justice found that the testimony of Annette Lussier and John Malisz was "totally credible."

When McAssey assumed the witness stand, he put his credibility on the line; and there is evidence in the record that supports the conclusion that as McAssey came along Route 146 driving a 318-horsepower rig that weighed fourteen tons, he was completely oblivious to the safety of others, for he was preoccupied with the thought of making it out to the terminal in time to dash from there to the ball park where he might catch a late inning or two and see his offspring in action. McAssey estimated that at the time of the collision, he had about an hour to get to the terminal and then to the ball park. It was also clear from the record that when McAssey came over the hill, he had an unobstructed view of the roadway as far away as the second set of lights. Implicit in the trial justice's denial of the motion for new trial was his conclusion that McAssey paid no attention to the U-turn motorist or to his blinking directional signal or to the Rustic traffic signal as he hurried up the hill to the second set of lights where he said he knew he would have to stop.

■ Having in mind the evidence to which we have just alluded, the jury and the trial justice were amply justified in finding that McAssey certainly knew or should have known that his preoccupation with completing a double play—getting to the barn and to the ball game—posed a substantial risk of harm to many of the motorists who were proceeding either northerly or southerly along Route 146 at the time in question, and he did nothing to alleviate the situation. Even though he may not have intended to inflict injury on any of his fellow travelers, he was wholly inattentive to what was taking place before his very eyes. His failure to exhibit a modicum of vigilance or to decrease his speed or to diminish the risk of collision all provide an ample evidentiary basis [5] for the jury's

---

5. If McAssey had prevailed here on his claim of insufficient evidence to support the conviction, acquittal would have been in order because of his constitutional protection against double

guilty verdict and the trial justice's denial of the motion for new trial.

In *State v. Arnold*, R.I., 404 A.2d 490, 492 (1979), we noted that today the operation of a motor vehicle can pose a substantial risk of harm to both pedestrians and the motoring public, and one who incorrectly judges the manner in which to reduce this potential to its least probable level may be described as negligent, but one who ignores the hazard altogether will be called reckless. McAssey's conduct as he headed on toward Woonsocket and the ball park certainly fits into the latter category.

The defendant's appeal is denied and dismissed, and the judgment of conviction appealed from is affirmed.

SHEA, J., did not participate.

jeopardy. *Hudson v. Louisiana*, —— U.S. ——, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981); *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).