STATE

v.

**Gerald M. TILLINGHAST and Harold L. Tillinghast.**

**No. 80–181–C.A.**

Supreme Court of Rhode Island.

Sept. 1, 1983.

---

1. *Ognibene v. Rochester Mfg. Co.,* 298 N.Y. 85, 89, 80 N.E.2d 749, 750 (1948) (Desmond, J., dissenting.)

Dennis J. Roberts II, Atty. Gen., Stephen R. Famiglietti, Asst. Atty. Gen., for plaintiff.

Joni Seplocha, Cranston, for Gerald Tillinghast.

Joseph A. Bevilacqua, Jr., Providence, for Harold Tillinghast.

## OPINION

KELLEHER, Justice.

The defendants, Gerald M. Tillinghast and Harold L. Tillinghast, are brothers. Back in November 1978 Gerald worked for the city of Providence as an environmental-control inspector and Harold managed a restaurant situated in Providence on Broad Street. Today, the brothers are in prison following a Superior Court jury verdict which found that they murdered one George Basmajian on November 30, 1978, and that they had in their possession at that

time a stolen car, specifically, a 1974 Mercury sedan. Hereinafter we shall refer to the brothers either by their family name (Tillinghasts) or by their respective first names (Gerald or Harold) and to the deceased by his last name (Basmajian).

Today, Vincent P. Vespia, Jr., is the chief of South Kingstown's police department. However, on the afternoon of November 30, 1978, he was a lieutenant in the detective division of the Rhode Island State Police. His assignment on this particular day was to serve as a member of a surveillance team that was composed of members of both the State Police and the Federal Bureau of Investigation. The subject of the day's surveillance was Basmajian. The team's membership varied. At one point on the day in question, it comprised six officers. Thereafter, it was reduced to four, and later in the day the team was further reduced to three.

The mission of the surveillance team was, in the words of one of its members, State Police detective Lieutenant Thomas C. Griffin, to take a periodic look at "different underworld figures to see what their activities are." On November 30, 1978, surveillance began at 8 a.m. as Lieutenant Griffin in one unmarked car and FBI agent Robert M. Hargraves in another unmarked vehicle took up strategic positions near Basmajian's Johnston home. The record indicates that there was no activity during the morning but that during the afternoon Basmajian and his wife were observed as they left their residence and traveled to Providence to the Registry of Motor Vehicles. Mrs. Basmajian was the driver. She was driving a 1978 Lincoln Continental.

When the Basmajians left the registry office, the surveillance team consisted of Lieutenants Vespia and Griffin and Philip G. Reilly, an FBI agent assigned to the Bureau's Providence office. The trio followed the Basmajians as the husband, now acting as the chauffeur, drove away and returned to Johnston to the home of Mrs. Basmajian's father. Later, Basmajian picked up a friend, David Cianci, in the

Thornton section of Johnston and made his way with Cianci to an establishment called Michael's Lounge at 125 Broadway. It was estimated that Basmajian arrived at the lounge somewhere within the 5:45 to 6 p.m. time frame. As the duo entered the lounge, Lieutenant Vespia noticed that Gerald's 1975 Lincoln Continental was parked alongside the northerly curb of Broadway directly in front of the bar.

About fifteen minutes after their arrival, Basmajian and Cianci left the bar and the Broadway area. They were watched as they entered a restaurant situated in Johnston's Thornton area. Later, at 6:45 p.m. Basmajian left Cianci, entered his Lincoln, and returned to Michael's Lounge.

It should be noted that the members of the surveillance team were dressed in civilian clothes, driving unmarked vehicles, and in constant electronic touch with each other. The State Police were also using binoculars.

Lieutenant Vespia was parked on the southerly side of Broadway just west of the intersection of Broadway and Dean Street. As he watched Basmajian and Gerald emerge from the lounge, he noticed that Gerald was wearing a golf-type cap and a dark, three-quarter-length jacket that had gold lettering on the back. After Basmajian and Gerald had completed their sidewalk conversation, Basmajian walked over to his Lincoln Continental, which was now parked alongside the southerly side of Broadway, and drove off. At this point, the team decided to split up, with Agent Reilly and Lieutenant Griffin keeping an eye on Basmajian and Lieutenant Vespia remaining in the Broadway area.

At approximately 7:21 p.m., Lieutenant Vespia observed Gerald as he walked out of the lounge to a nearby phone booth. After making a telephone call, he returned to the lounge. Later, at 8:05 p.m., Gerald, who had been pacing up and down the sidewalk in front of the lounge, was seen to cross over to a small parking lot situated next to the Providence headquarters of the Internal Revenue Service. There he met his broth-

er, Harold, who had arrived in his Cadillac Eldorado. After a brief conversation, the Tillinghasts returned to the lounge.

Basmajian then reappeared on the scene and this time parked his vehicle on Barclay Street, a very narrow street situated just west of the lounge. The trunk portion of the Continental could be clearly seen by Lieutenant Vespia.

Basmajian had changed his clothes. Earlier he had been attired in a brown, three-piece suit, but as he entered the lounge at 8 p.m. he was wearing dark trousers and a black jacket with white sleeves. Basmajian and Gerald were observed as they came out and examined the interior of the trunk of Basmajian's vehicle. Gerald was wearing a golf cap, and the lettering on his jacket was now legible—it said, "Brass Rail." It soon became apparent to Lieutenant Vespia that Basmajian and Gerald were about to enter Basmajian's Lincoln and leave the area.

The lieutenant, in attempting to establish a new point of surveillance, made a series of turns and ended up traveling north on Dean Street. As he approached the intersection of Broadway and Dean Street, the green light was in his favor so he turned westerly toward Olneyville. As he made the turn, the lieutenant noticed that the first car in line at the red light halting traffic on Broadway was Basmajian's. After traveling about two blocks, Lieutenant Vespia glanced into the rear-view mirror just in time to see Basmajian negotiating a right turn with Gerald sitting alongside him. The lieutenant took his next right, but the Lincoln was nowhere to be seen. He thereupon notified Griffin and Reilly that he no longer had the Lincoln under surveillance.

At this time, Reilly and Griffin were in Johnston. Upon receiving the communication from Lieutenant Vespia, Reilly checked the area near Basmajian's residence while Griffin reconnoitered the Silver Lake section of Providence. However, in due course the entire team headed toward an area east of Elmwood Avenue in Cranston near a social club that Basmajian was known to frequent. Lieutenant Vespia was the first

to arrive in Cranston, and he assumed a surveillance point in the parking lot of a bowling alley situated on the easterly side of Elmwood Avenue in Cranston.

At approximately 9 p.m., he observed a 1974 yellow Mercury sedan come out from behind the bowling alley and pass directly in front of him. As the vehicle passed by him, proceeding at approximately 5 miles per hour, the officer observed Gerald driving, Harold sitting on the passenger side of the front seat, and Basmajian occupying the right-hand side of the back seat. The lieutenant began following the Mercury and at the same time notified Reilly and Griffin of what was happening. From a position one or two car lengths behind the Mercury, Lieutenant Vespia proceeded to follow Gerald, who headed north on Elmwood Avenue, east on Park Avenue, north onto Route 10, and south onto Interstate Route 95.

As Lieutenant Vespia followed the Mercury along Route 95, he was able to see three figures sitting in the car, two in the front seat and one in the back. When the Mercury approached exit ramp No. 13, it turned to the right and entered a roadway best known as the airport connector. This highway permits a southbound motorist either to travel to Theodore F. Green Airport or to come out onto Post Road in Warwick. The southbound motorist who exits at this point first turns to the right and, after traveling a short distance, negotiates a rather long curve to the left as the roadway turns toward the east, crosses over Route 95, and heads toward the airport. As a vehicle approaches the passenger terminal, the road once again begins to curve. A series of strategically placed traffic islands allows the motorist either to proceed to a parking area or to travel out onto Post Road.

Lieutenant Vespia followed the Mercury as it entered the connector, and as he was negotiating the left-hand curve, he momentarily lost sight of the Mercury because the state had erected a snow fence some five to six feet in height along the divider that separates the airport-and-Post-Road-bound

traffic from other motorists who are proceeding along the connector on the other side of the divider and exiting southerly onto Route 95. The connector was thus constructed so as to allow two lines of traffic to proceed on either side of the divider.

As Vespia regained sight of the Mercury, he was joined by Agent Reilly. They switched positions; Reilly became the team leader, and Vespia dropped back to second position. The operator of the Mercury proceeded toward the Post Road exit. The traffic light at the Post-Road-airport-connector intersection turned red. The Mercury came to a halt; Agent Reilly stopped behind the Mercury; Lieutenant Vespia then came to a halt behind Reilly; and bringing up the rear was Lieutenant Griffin.

Reilly and Vespia both realized that the back-seat passenger could no longer be seen. At that time the only visible occupants of the Mercury were the driver and the front-seat passenger. It was now approximately 9:15 p.m. When the light turned green, the Mercury turned left onto Post Road, and at this point Lieutenant Vespia observed Gerald behind the wheel, still wearing his golf cap. After turning left onto Post Road, the Mercury immediately made a right-hand turn onto Fullerton Street. The surveillance team continued along Post Road because, in Lieutenant Vespia's words, " * * * we would have been made. * * * That's a police term for identified."

After a few minutes, the team decided to survey various portions of the area west of Post Road. At 9:20 p.m. Agent Reilly radioed his colleagues that he had discovered the Mercury. It was found in a parking lot a block away from Fullerton Street behind the premises of a car-rental agency. When the officers looked into the Mercury, they saw Basmajian lying on the back seat. He was dead, blood still "gushing" from a "huge head wound." After a brief discussion, Vespia and Reilly left the scene in Vespia's car and headed for the Cranston social club. Griffin remained on the scene

and notified State Police headquarters of the team's discovery.

The social-club visit proved unproductive so Vespia and Reilly went to Michael's Lounge. They arrived at approximately 9:55 p.m. After entering the premises, they observed the Tillinghasts sitting at a table. They were arrested and taken to State Police headquarters. When the police and their quarry arrived at headquarters, Gerald was wearing his golf cap and his "Brass Rail" jacket.

Lieutenant Vespia told the jury that when he looked at the sleeve of the jacket, he noticed it was wet with what appeared to him to be a "quantity" of blood. Subsequent investigation revealed that the Mercury had been stolen during the afternoon of March 30 from a garage situated in Providence at 757 Manton Avenue. This address was approximately one mile from the address used by the Tillinghasts. Basmajian's Lincoln was found in the bowling-alley parking lot.

A medical examiner testified that the deceased had received nine gunshot wounds, three in the front torso and six in the right side of the face. He was of the belief that it was much more likely that the shots to the torso preceded the shots to the head and that it was quite unlikely that the driver, while going around the curve, could have shot the back-seat passenger. He also explained that his findings were consistent with the belief that the nine shots had emanated from the passenger side of the car. The firearms expert from the FBI concluded that a .38-caliber revolver was the murder weapon. His tests indicated that all nine bullets had been fired from the same weapon, and he then explained that most .38-caliber revolvers hold six bullets, some contain five, but none has a nine-cartridge capacity.

Both Gerald and Harold testified, and they insisted that they had nothing to do with the homicide. They claim that they were both at the lounge at the time the Mercury was traveling south on Route 95. A number of the lounge's clientele testified

in support of the Tillinghasts, insisting that on the evening of November 30, 1978, they were miles away from the airport connector. Gerald also presented a number of expert witnesses who took exception to the conclusions expressed by the medical examiner and several experts employed by the FBI.

In their respective appeals Gerald and Harold have raised several issues, all of which relate to rulings made by the trial justice in (1) his consideration of the admissibility of certain evidence, (2) the charge to the jury, and (3) Harold's motion for a new trial.

One of the defense witnesses was Edmund DiMeglio. He is a cinematographer of some thirty years' experience. In July of 1979 he filmed a car similar to the 1974 Mercury, and like the Mercury, occupied by two individuals, turning left off the airport connector onto Post Road. The film was shot from four separate vantage points, each of which attempted to approximate the relative positions held by the surveillance team on the evening of November 30, 1978. Another section of the film, taken from the intersection of Dean Street and Broadway, showed two people standing in front of Michael's Lounge, apparently reproducing what Lieutenant Vespia indicated that he had seen on the night of the murder.

Trial counsel for Gerald told the trial justice that the sole purpose for using the film was to assist the jury in better understanding the evidence. Before us, Gerald's appellate counsel insists that the movie would have impeached the testimony given by Lieutenant Vespia and Agent Reilly. The trial justice viewed the eight-minute footage taken during the daylight hours of July of 1979 and ruled that, in his opinion, this evidence would be of no assistance "whatsoever" to the jury, pointing out that the jury had already viewed at night the areas in question.

■ The basic principles that govern the admissibility of photographs also govern the admission of motion pictures. First, it must be shown that the film is fair and accurately represents or portrays the events in question. *State v. Pulphus,* 465 A.2d 153 (R.I.1983). Whether sufficient foundation has been established for its admission is a question directed at the sound discretion of the trial court. *State v. Deering,* 291 N.W.2d 38 (Iowa 1980); 3 Wharton, *Criminal Evidence,* § 639 (13th ed. 1973); 3 Wigmore, *Evidence,* § 789(b) (1970 ed.). Where, as here, the movie in question is a reconstruction of certain events and purports to show what a witness could or could not have seen, evidence must be adduced demonstrating that conditions at the picture-taking time were substantially similar to those that existed at the time in question. *State v. Johnson,* 291 Minn. 407, 91, 192 N.W.2d 87, 91 (1971); 3 Scott, *Photographic Evidence,* § 1322 at 185–86 (1969 ed.); 3 Wigmore, *Evidence,* § 798 (1970 ed.). Also, as with all other evidence, the party attempting to introduce the evidence must demonstrate that it is relevant, that is, it must tend " 'to prove or disprove a point provable in the case.' " *State v. Pulphus,* at 157.

■ Here, we cannot fault the trial justice. The events at the Post-Road-airport-connector intersection took place at night, and a portion of the available illumination came from a nearby gas station. In contrast, the cinematographer worked in the daylight and at one time apparently pointed his camera into the sun. His camera-lens nighttime portrayal of the sidewalk scene cannot pass muster because nobody took the trouble to find out what were the power-of-magnification capabilities of the binoculars used by Lieutenant Vespia. There was also a dispute as to the accuracy of the placing by the cinematographer of Reilly's vehicle at the intersection, and there was no evidence that the model cars were of the same height, width, and window space as those used by the surveillance team.

■ One of the state's experts was a special agent with the FBI whose specialty

is the comparison and matching of human hairs. During his direct testimony, this witness reported that he had found hairs inside the yellow Mercury which were microscopically similar to sample hairs taken from Gerald and Harold. This discovery established the fact that the Tillinghasts were inside the Mercury, if not at the time of the murder, then at some other time that was not explained. On appeal, Gerald's appellate counsel contends that the trial justice should have passed the case because of the prosecution's failure to furnish the defense with certain "exculpatory" evidence that she described as "a test on hair samples from the victim's car."

This claim completely misses the mark because the record indicates that the motion to pass came after the agent had testified in redirect examination that he had compared a known sample of Gerald's hair with hairs found by the State Police in Gerald's Lincoln Continental rather than in Basmajian's Lincoln. Obviously, the fact that Gerald's hair was found in his own car is neither exculpatory nor prejudicial to him. Since he owned the Lincoln, one would expect to find his hair in his car. The denial of the motion to pass was well warranted.

In order to sustain a conviction on the receiving-of-stolen-goods counts, the state was required to show that the 1974 yellow Mercury had a November 30, 1978 value in excess of $500.[1] In seeking to sustain this burden, the state produced three witnesses, none of whose names was furnished to Harold, who had taken advantage of Rule 16 of the Superior Court Rules of Criminal Procedure and asked the state to furnish him with a list of the names of the witnesses it expected to call at trial.

The state had listed the Mercury owner's name, but she had died prior to trial. The deceased's son testified during direct examination that his mother's car had been stolen. However, in cross-examination he conceded that there was a possibility that his

mother on November 30, 1978, had allowed somebody to take the car. Thus, the state, in order to counter this testimony, produced a Providence police officer and a State Police civilian employee.

The officer testified that on November 30, 1978, he responded to a call to the deceased's home on Manton Avenue in Providence and received a report that her car had been stolen. The civilian employee testified that once the department had received a teletype announcement relative to the theft of the 1974 Mercury, the report of the theft was filed with the National Crime Information Center.

The third witness was a vice president and general manager of a Providence automobile agency. He told the jury that on the day of its theft, the yellow Mercury had a retail value of $1,900 and a wholesale value of $1,300.

■ As this court noted in *State v. Concannon*, R.I., 457 A.2d 1350, 1353 (1983), the imposition of a sanction for violation of Rule 16 involves the discretion of the trial justice; and in the fashioning of such a sanction, consideration should be given to the reason for the nondisclosure, the extent of the prejudice to the opposing party, the feasibility of rectifying by a continuance, and any other relevant factors. Here, the necessity for the appearance of the police officer and the civilian employee was totally unforeseeable. The prosecutor conceded that he had forgotten about the necessity of establishing the value of the car.

■ We fail to see how the defense was prejudiced by the events in question. The only question concerned the car's value, and when the representative of the automobile dealer gave its book value, no one took issue with his report or requested a continuance to dispute his testimony. In *State v. Silva*, 118 R.I. 408, 374 A.2d 106 (1977), we faulted the trial justice for excluding defense testimony on the basis that it failed to comply

---

1. If an individual receives stolen goods that have a value in excess of $500, such individual is deemed to have committed a felony, but if the value does not exceed $500, the crime is deemed to be a misdemeanor. *See* G.L.1956 (1981 Reenactment) § 11–41–5.

with the provisions of Rule 16 and noted that barring a party from calling a witness is a drastic sanction to be imposed in a trial where the goal is the ascertainment of truth. What was said in *Silva* is equally apropos to the case at bar. We have no doubt that the Tillinghasts were well aware that the yellow Mercury that had been reported stolen during the afternoon of November 30, 1978, had a value well in excess of the $500 limit set forth in the statute.

In his charge to the jury, the trial justice, in defining the crime of murder, told the jury that "murder" is the "unlawful killing of a human being with malice aforethought." "Malice aforethought," he explained, is also called "premeditation." "Malice aforethought is the conscious design or intent to kill. That is that, before the killing, the defendant thought of doing it, and acted upon that thought." Harold now complains that the trial justice should have defined the term "malice."

■ We shall not consider this contention because the defense failed to comply with Super.R.Crim.P. 30 and its requirement that a party objecting to the charge must inform the trial justice in clear and distinct language the matter in regard to which objection is being lodged and the grounds for objection. Otherwise, the objection will not be considered on appeal, for, as this court has so frequently said, if a defendant has neither objected to the charge nor requested a different one, the charge as given becomes the law of the case. *State v. Romano*, R.I., 456 A.2d 746 (1983); *State v. Collazo*, R.I., 446 A.2d 1006 (1982); *State v. McAssey*, R.I., 432 A.2d 683 (1981). At trial nobody lodged an objection to the portion of the charge now being challenged.

After explaining to the jury that a defendant's intent can be determined from a consideration of one's conduct, the trial justice then continued and told the jury that on the evidence before it, the jury had but one choice in the event it voted for a guilty verdict; the verdict that would be returned in such event would be murder in the first degree. The Tillinghasts now claim that the trial justice should have afforded the jury an opportunity to return a second-degree-murder verdict.

■ Recently, in *State v. Innis*, R.I., 433 A.2d 646, 651 (1981), this court emphasized that instruction should not be given on the lesser degree of murder or manslaughter when there is no evidence to support such a verdict. As this court has noted, the critical difference between the two degrees of murder is the time between the formation of the homicidal intent and the killing itself. If the premeditation is more than momentary, the murder is one of first degree and no charge on second degree is necessary; if the premeditation could be less, then the offense may be murder in either the first or second degree and a charge on both must be given. *State v. Myers*, 115 R.I. 583, 591, 350 A.2d 611, 615 (1976).

■ The critical evidence in regard to this phase of the Tillinghasts' appeal came from the medical examiner, Dr. William Q. Sturner. He indicated that Basmajian was first shot three times in the torso and then six times in the head. It was his opinion that all nine shots originated from a point within three feet of the deceased. When the medical examiner was asked how long Basmajian had lived after sustaining the nine wounds, the witness replied by first pointing to one of the chest wounds in a photograph and then saying that death had occurred within a matter of minutes. Thus, it is clear that even though death was imminent, bullets continued to be fired from the front seat. This evidence, plus the observations made during the ongoing surveillance, clearly indicates that Basmajian's death was not a sudden shooting but a well-planned execution that, unfortunately for the Tillinghasts, failed to take into consideration the fortuitous fact that Basmajian was to be the subject of the surveillance team's scrutiny on November 30, 1978. Thus, the trial justice's refusal to charge on second-degree murder was unquestionably correct.

The trial justice has also been faulted for his refusal to charge the jury that since the defense of an alibi was offered, it was the state's burden to prove beyond a reasonable doubt that Gerald and Harold "were not at Michael's Lounge on the evening of November 30, 1978." We would first point out that the request misrepresents the state's position. The state has always conceded that there were times during the evening of November 30, 1978, when the Tillinghasts were in the lounge. The dispute was over the times when they allegedly left the premises. Obviously, the request is based upon the Supreme Court's admonition that the prosecution must prove every element of the crime charged beyond a reasonable doubt. *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). However, subsequently, in *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), the Court made it clear that the burden of persuasion on affirmative defenses may be shifted to the defendant and went on to define "affirmative defense" as one that "does not serve to negative any facts of the crime which the State is to prove in order to convict * * *." *Id.* at 206–07, 97 S.Ct. at 2325, 53 L.Ed.2d at 290.

In *State v. Alexander*, 245 S.E.2d 633 (W.Va.1978), the West Virginia Supreme Court upheld the trial justice's instruction which charged that where the state had established a prima facie case and the defendant had relied upon the defense of an alibi, the burden was upon the defendant to prove the alibi, not beyond a reasonable doubt or by the preponderance of the evidence, but by such evidence as would, when considered with the evidence as a whole, create in the minds of the jurors a reasonable doubt in regard to the accused's guilt. However, in *Adkins v. Bordenkircher*, 674 F.2d 279 (4th Cir.1982), the Court of Appeals faulted the *Alexander* type of charge, vacated Adkins' conviction, and pointed out that an alibi negatives every fact necessary to prove the crime because the defendant could not commit the offense if he was elsewhere at the time, and in the process the court rejected the West Virginia court's characterization of the alibi as an affirmative defense.

Here, however, the trial justice did not travel the path taken by the West Virginia court. He told the jury in simple and direct language that the burden was upon the state to prove beyond a reasonable doubt the essential elements of the offenses charged. He also reminded the jury that the presumption of innocence remained with the Tillinghasts until such time as each juror was persuaded by proof beyond a reasonable doubt as to the brothers' joint guilt or individual guilt. The trial justice then also stressed that "the defendant does not have to prove his innocence. He does not have to prove anything. The burden of proof in a criminal case is on the State and never shifts to the defendant."

After explaining the various elements of the murder and receiving counts, the trial justice once again admonished the jurors that if it was their unanimous belief that the state had proved defendants guilty beyond a reasonable doubt, they should return guilty verdicts but, by the same token, if they believed that the state had failed to prove the guilt of one or both of the defendants beyond a reasonable doubt, they should without any hesitation return one or two not-guilty verdicts.

█ It is clear from our consideration of the entire charge that the jury was well aware that even though the Tillinghasts had presented evidence indicating that they were some place other than at the scene of the crime, no burden had been cast upon them. The jury was quite cognizant that the state was still required to establish every element of the crimes charged beyond a reasonable doubt. One such element was proof by the state of the Tillinghasts' presence in the yellow Mercury as it traveled along the connector, over Post Road, to the area behind the car-rental agency. The state, by proving its own case beyond a reasonable doubt, necessarily disproved the alibi evidence. Despite their assertions to

the contrary, no burden of proof whatever was imposed upon the Tillinghasts.

The denial of Harold's new-trial motion merits little discussion. The trial justice, after an exhaustive review of the evidence that was adduced at a lengthy trial, quite properly classified the case as "one to be decided on credibility." He rejected the "alibi" testimony of the defense witnesses, who insisted that the Tillinghasts were at Michael's Lounge at the time Lieutenant Vespia was trailing the yellow Mercury south on Route 95 and along the airport connector. On the other hand, the trial justice believed the prosecution witnesses because they were credible. Lieutenant Vespia had said that Harold was a front-seat passenger when the Mercury passed by him in the bowling-alley parking lot. Agent Reilly also testified that as he waited at the red light behind the Mercury, he was able to see the front-seat passenger. He identified the passenger as Harold. The trial justice also said that he was convinced from the evidence adduced at the trial that Gerald and Harold were guilty as charged.

There is no question but that the trial justice exercised his independent judgment and chose to believe the state's witnesses. We see no reason to question his belief, and we do not find that he overlooked or misconceived evidence or was clearly wrong in his denial of the motion for a new trial.

The defendants' appeal is denied and dismissed, the judgments of conviction appealed from are affirmed, and the case is remanded to the Superior Court.

BEVILACQUA, C.J., did not participate.