**Charles Wayne SMITH, Jr., Appellant,**

**v.**

**The STATE of Oklahoma, Appellee.**

**No. F–73–367.**

Court of Criminal Appeals of Oklahoma.

March 7, 1974.

Tom Morgan, Watonga, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., James C. Peck, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Charles Wayne Smith, Jr., hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Blaine County, Case No. CRF–73–10, for the offense of Robbery in the First Degree. His punishment was fixed at five (5) years imprisonment and from said judgment and sentence, a timely appeal has been perfected to this Court.

Monroe Ellis first testified for the State that he had known the defendant for approximately one year. He stated that on March 24, 1973, he and the defendant went to the home of Mr. Fred Brunson in order for Mr. Ellis to pay a debt he owed Mr. Brunson. He testified that the defendant was in the presence of Mr. Brunson for approximately ten minutes.

Fred Brunson, the complaining witness and apparently a bootlegger, testified that on March 24, 1973, he saw Monroe Ellis and the defendant together at his house when Mr. Ellis came to pay off a debt. He testified that he next saw the defendant on March 31, 1973, at his home. Brunson testified that the defendant came to his home and asked to buy a pint of whiskey. The defendant came into the house and told Brunson that he was an FBI agent and showed him a badge. The defendant told him to be quiet and that he was not going to hurt him. Brunson then testified that the defendant went throughout the house, turning on all the lights and looking in each room. The defendant then handcuffed Brunson to a roll-away bed in the back bedroom of the house and searched the house. Defendant then returned and released him and took him to a bedroom where the defendant tied him to the bed. Brunson pleaded with the defendant not to tie him to the bed because of his ill health. The defendant complied by taking him into the living room of the house where he seated him in a chair and tied his hands and feet with strips of cloth. Brunson further testified that the defendant took two $20 bills from his person and subsequently, Brunson found that he was missing a small purse, two $5 bills, $5 in quarters, various loose change, and some bottles of whiskey. He did not give anyone permission to take his property and it was taken against his will. He did not resist the defendant because he was physically unable and was afraid of the defendant. After the defendant left the house, Brunson freed himself and reported the incident to the Sheriff. Brunson further testified that he accompanied the police officers to the home of Monroe Ellis and then to the home of Mrs. Willie Lee Ellis where he identified his property. Brunson identified the defendant at the Sheriff's Office.

Willie Lee Ellis testified that she was the mother of Monroe Ellis and that the defendant in this case was married to her niece. On March 31, 1973, the defendant came to her house around 10:00 or 10:30 p. m. to watch television. The defendant brought a box into the house and set it

down and she observed the inside of the box which contained bottles of whiskey. At her request, the defendant put the box in the kitchen cabinets so it would be hidden from her grandchildren. At approximately 11:00 or 12:00 p. m. the defendant retired to the rear bedroom of the house to take a nap. Approximately twenty to thirty minutes after the defendant had gone to bed, some police officers arrived at her house and asked for the defendant. She called the defendant to the front room of the house and the officers questioned the defendant in the dining room and then led him from the house. She further testified that Brunson came to her house with the police officers and told them what had been taken from him. After the officers and Brunson left the house, Mrs. Ellis called the Sheriff's Office and told them to return to her house and pick up the evidence. She further testified that the police officers searched her house with her consent. During the search of her house, the officers found the case of whiskey, a pair of handcuffs, a badge, and some money. She was shown all of the evidence alleged to have belonged to the defendant and stated that none of it belonged to her.

R. A. McLaughlin testified that he was employed as a police officer for the City of Watonga, Oklahoma. On the night of March 31, 1973, he was at the Blaine County Sheriff's Office when Brunson reported the robbery. McLaughlin, Brunson, and Officer Willis went to the home of Monroe Ellis and determined that Charles Wayne Smith was the individual for whom they were looking. Monroe Ellis informed the officer that the defendant was at the home of Mrs. Willie Lee Ellis. McLaughlin and Willis then returned Brunson to the Sheriff's Office and asked Trooper Morgan, of the Oklahoma Highway Patrol, to accompany them to the home of Mrs. Ellis. Upon arriving at the Ellis residence, they asked Mrs. Ellis if the defendant was there at that time. She then called the defendant from the rear of the house to the front where the officers were, at which time the officers asked the defendant to accompany them to the Sheriff's Office. Officer McLaughlin further testified that when they arrived at the Sheriff's Office, Mrs. Ellis telephoned them and at that time they returned to her residence to search for property taken in the robbery. He further testified that they searched the Ellis house with Mrs. Ellis' consent and found a case of whiskey, a trucker's wallet, some bills, small change, and a little white purse, a pair of handcuffs, and a folder containing a badge.

James Louis Winters testified that he was employed as the Deputy Sheriff, Blaine County. He testified to the chain of custody in regard to State's Exhibits 1, 2, 3, 4, 6 and 7.

Billie Dean Willis testified that on March 31, 1973, he was employed as an officer of the Watonga City Police Department. Willis' testimony was substantially the same as that offered by Officer McLaughlin.

The defendant testified in his own behalf that on March 24, 1973, he accompanied Monroe Ellis to the home of Mr. Fred Brunson and at that time met Mr. Brunson. Later on March 31, 1973, he went to the home of Mr. Brunson and stated to Brunson that he wished to purchase twelve half-pints of whiskey and Brunson told him that it would cost $24. The defendant then gave him two $20 bills and he put the money in a coin purse and went into the back room of the house. Brunson returned with a large box and layed it on a table and the defendant asked him for his change. At this time Brunson denied that he owed the defendant any change, at which point the defendant and Brunson became engaged in an argument. The defendant was ordered to leave the house by Brunson. The defendant further testified that at one time he had been employed as a security officer in Los Angeles, California, and he had the badge from that employment with him on the evening of March 31, 1973. He pulled the badge out of his pocket and showed it to Brunson, stating to him that he was an officer and that he

was going to arrest him for bootlegging if he did not return the money. Brunson then walked to the back of the house and the defendant followed him there and ordered him to be seated in a chair. The defendant then got some pieces of string hanging over the door of the bedroom and tied his hands. The defendant testified that Brunson threatened to kill him if he did not leave the house at that time. The defendant picked up the box and left the house. As the defendant was leaving the house, he observed another man, that he did not know, walking toward the house. The defendant then went to his aunt's home, Mrs. Willie Lee Ellis, where he opened the box at that time and realized that there was more whiskey than he had asked for and that Brunson's coin purse was in the box. The defendant then decided to lie down and rest and wait until in the morning to return the items to Brunson because he feared that Brunson was too angry at that time. A short time later the police came and took the defendant to the Sheriff's Office where Brunson identified him as the person who had robbed him. The defendant was then placed under arrest. The defendant denied that he had at anytime used the handcuffs on Brunson.

The defendant's first proposition of error asserts that the search of the home of Mrs. Ellis was unlawful and that as a result, the trial court erred when it refused to sustain the defendant's motion to suppress evidence obtained as a result of that search. The defendant's argument under this proposition is based on the fact that his permission to search Mrs. Ellis' home was not given, therefore, the search was invalid.

■ The law in this jurisdiction is well settled that the defendant, who is a victim of a search, has standing to challenge the legality of the search although he has no possessory interest or legal title in the premises or object seized. Therefore, in the instant case the defendant did have standing to object to the search. However, it is this Court's opinion that the search

was lawful due to the consent given by Mrs. Ellis. In the case of Stucker v. State, Okl.Cr., 493 P.2d 84 (1972), this Court stated at page 89 of the official opinion:

"Apart from standing however, the search was lawful since the owner of the premises had authority to consent to the search. It was in the nature of a lawful search by consent of the third party. Standing and consent are not the same thing. Ordinarily where two or more persons have equal rights to use or occupancy of premises, any one of them is capable of consenting to the search. . . ."

See also Leeper v. United States, 446 F.2d 281 (10 Cir. 1971). We therefore find no error in the trial court overruling the defendant's motion to suppress.

■ The defendant's second proposition of error asserts that the trial court erred in overruling his demurrer to the evidence since there was no showing of the use of force or fear, nor did the victim have any knowledge of anything being taken. In support of this proposition, the defendant cites 21 O.S.1971, § 792 and § 796 which state:

"To constitute robbery, the force or fear must be employed either to obtain or retain possession of the property, or to prevent or overcome resistance to the taking. If employed merely as a means of escape, it does not constitute robbery. (§ 792)

\* \* \* \* \* \*

"The taking of property from the person of another is not robbery, when it clearly appears that the taking was fully completed without his knowledge" (§ 796)

In the case of Mitchell v. State, Okl.Cr., 408 P.2d 566 (1965), this Court stated at pages 570 and 571 of the official opinion:

"To constitute robbery the taking of the property must be accomplished by force or by putting the victim in fear. The force or intimidation is the gist of the offense.

"In 57 L.R.A. 432 and 8 A.L.R. 359 are annotations wherein authorities are cited in support of the rule that if the taking of property from the person of another is accomplished by force, although the victim does not know what is being done, it is, nevertheless, robbery.

"In a South Dakota case, State v. Stecker, 79 S.D. 79, 108 N.W.2d 47, with a statute similar to our § 796, it was stated:

'It was not necessary to a conviction to show that the victim was aware at the time that he was being robbed. Force or fear must be used to obtain possession of the property or to prevent or overcome resistance to the taking.'

"It is stated in the state's brief, quoting from 2 Wharton's Criminal Law and Procedure (1927), § 554, at pg. 256:

'* * * Thus it is possible to be guilty of robbery of a person knocked unconscious before he realized that the defendant intended to rob him or to use force. * * *'

"And, on the lack of knowledge of the defendant, the state further quotes Wharton's § 554, at pg. 256:

'The element of "against the will" is satisfied by proof that the taking was "without the consent" of the victim. Thus robbery is committed when the taking is accomplished by the use of force although the victim was deceived as to the purpose of the force and did not apprehend or perceive that a robbery was intended or being committed. But the mere taking of goods from an unconscious person, without force or the intent to use force, is not robbery, unless such unconsciousness was produced expressly for the purpose of taking the property in charge of such person.' "

At page 42 and 47 of the transcript, we find the following testimony:

"Q.   And what happened to that money?

"A.   I don't know.

"Q.   Did you have it after this gentleman left?

"A.   I don't even know that, but when we went and checked there, that is where we found it.  I don't know what the gentleman taken out in the house, Mr. Earl, when he had me hogtied, but they found that junk at Mrs. Ellis'.  Just a minute.  *He had me to go in my pocketbook, so he knew how much money I had in there.  Then this here.  And I know I had two twenty dollar bills, and he seen that, and that is all he taken out of up here.*  Well, there wasn't any more in it.

"Q.   *But he did take that?*

"A.   *That's right.*   (Emphasis added)

\*    \*    \*    \*    \*    \*

"Q.   Mr. Fred—Mr. Brunson, did you give this defendant your consent to take your money and property?

"A.   No, sir.  I haven't give him no consent on nothing.

"Q.   Was it against your will?

"A.   It was against my will.  There wasn't nothing I could do about it because I was scared of him.

"Q.   Did you try to resist or fight him?

"A.   No.  He kept telling me all the time, 'Be quiet.  We are not going to hurt you.  Be quiet.  We are not going to hurt you.'

"Q.   Just from a practical standpoint, why didn't you try to fight him?

"A.   I couldn't.  I wasn't in no shape to fight a young looking man like that.  Then, after he showed me them badges and things and he was an F.B.I. out of Oklahoma City, anybody would have been scared."

It is therefore our opinion that in the instant case there was sufficient evidence showing that the victim was aware that he was being robbed and that force and fear were used to obtain possession of the property.

The defendant's third and fourth propositions assert misconduct of the prosecuting attorney during cross-examination of the defendant.

■ The record reveals that the prosecuting attorney extensively cross-examined the defendant concerning his ownership and possession of a gun. It is our opinion that this evidence was collateral and thus not relevant to the crime for which the defendant was charged and should not have been presented to the jury. Although this evidence should not have been presented to the jury, the defendant has failed to show how he was prejudiced by this evidence. Further, the record reveals the first time the defendant objected to this line of questioning was only after the prosecuting attorney had thoroughly cross-examined the defendant as to his ownership of a gun. As the defendant received the minimum punishment provided by law and there was sufficient evidence for the jury to find the defendant guilty as charged, we believe any error was harmless. See 20 O.S.1971, § 3001.

■ The defendant further contends that the prosecuting attorney used a certain document when cross-examining the defendant as to prior convictions, thus indicating to the jury that it was a "rap sheet" and the defendant had a long criminal record. After careful review of the record, we find the following question by the prosecuting attorney and answer given by the defendant:

"Q. I'll ask you if, on July 12th, 1971, you were convicted of a felony and received a probationary period of twenty-four months.

"A. No, this wasn't. *You have the rap sheet.* Now how about reading it right? What happened, I was not convicted of it. That felony was dropped down to a misdemeanor on other circumstances." (Tr. 156–157) (Emphasis added)

It therefore appears that the defendant, by his own testimony, is the one who called the jury's attention to his "rap sheet." We therefore find that if any error occurred, it was invited error.

■ The defendant's final proposition asserts error of the trial court in instructing the jury. The record reveals that the trial court accepted and submitted to the jury all of the defendant's requested instructions. This Court has consistently held that where counsel is not satisfied with the instructions that are given, or desires the court to give any particular instruction, or to more definitely or sufficiently state any proposition embraced in the instructions, it is the duty of counsel to prepare and present to the court such desired instructions and request that they be given. In absence of such request, the Court of Criminal Appeals will not reverse a case if the instructions generally cover the subject matter of inquiry. See Raper v. State, Okl.Cr., 501 P.2d 847 (1972).

After a careful review of the instructions, it is this Court's opinion that the instructions generally covered the subject matter of inquiry and fairly and correctly state the law applicable to the case. We therefore find this proposition to be without merit.

For the foregoing reasons, the judgment and sentence appealed from is affirmed.

BLISS, P. J., and BRETT, J., concur.