STATE

v.

Thomas J. INNIS.

No. 75–333–C.A.

Supreme Court of Rhode Island.

July 29, 1981.

Kathryn A. Panciera Salmanson, Sp. Asst. Atty. Gen., Providence, for plaintiff.

John A. MacFadyen, III, Asst. Public Defender, Providence, for defendant.

## OPINION

KELLEHER, Justice.

This is the latest chapter in the continuing saga of *State v. Innis*. In 1975, Thomas J. Innis (Innis) was convicted in Superior Court of murder, kidnapping, and robbery. Innis appealed, and this court vacated his conviction after determining that the trial justice had erred by denying Innis's motion to suppress evidence relating to a shotgun and certain statements he had made to the police regarding its discovery because such evidence was the product of an illegal interrogation in violation of the standards established by *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), and *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See State v. Innis*, R.I., 391 A.2d 1158 (1978) (Kelleher and Joslin, JJ., dissenting). The United States Supreme Court granted certiorari in order to address for the first time the meaning of interrogation under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See Rhode Island v. Innis*, 440 U.S. 934, 99 S.Ct. 1277, 59 L.Ed.2d 492 (1979).

The Supreme Court reiterated that the *Miranda* safeguards come "into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 307–08 (1980). However, the Court concluded that Innis had not been subjected to an interrogation or its functional equivalent. It stated that "the conversation * * * included no express questioning of the respondent. Rather, that conversation was, at least in form, nothing

more than a dialogue between the two officers to which no response from the respondent was invited." *Id.* at 302, 100 S.Ct. at 1690, 64 L.Ed.2d at 308–09. Moreover, not only did the Court find an absence of direct questioning, it also failed to find that the conversation with Innis was the "functional equivalent" of questioning because the record did not establish that the police knew or should have known that their words "were reasonably likely to elicit an incriminating response from him." *Id.* at 303, 100 S.Ct. at 1691, 64 L.Ed.2d at 309. Although the Court acknowledged that Innis had been subjected to "subtle compulsion," it stated:

> "There is nothing in the record to suggest that the officers were aware that the respondent was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children. Nor is there anything in the record to suggest that the police knew that the respondent was unusually disoriented or upset at the time of his arrest." *Id.* at 302–03, 100 S.Ct. at 1690, 64 L.Ed.2d at 309.

Consequently, the judgment sustaining Innis's appeal was vacated, and the case was remanded to us for further proceedings.

On remand, we shall now consider those issues raised but not discussed in our initial consideration of this case as well as a claim made by Innis that, notwithstanding his unsuccessful earlier attempt to suppress the evidence, such evidence should be stricken because it is the result of an improper interrogation under the standards set forth in *State v. Travis*, 116 R.I. 678, 360 A.2d 548 (1976).

At this point, we shall pause briefly to review that portion of the record adduced at trial which relates solely to a scenario that played itself out prior to Innis's arrest.

In the early weeks of January 1975, Innis brought a shotgun to his girl friend's apartment and in her presence sawed off the weapon's stock and barrel. On the evening of January 12, 1975, he wrapped the shotgun in a blue and white blanket, went to the adjoining apartment, and asked the owner of the building to call a cab for him. When the first cab never arrived, a second was called. The dispatcher of the Silver Top Cab Company sent cab No. 21, with John Mulvaney driving, to pick up Innis. The owner of the building later testified that while Innis waited for the cab, he had a blue and white blanket "cradled" in his arms. When the cab arrived, Innis placed the blanket in the back seat and sat in front with Mulvaney. Mulvaney radioed the dispatcher that he was taking his fare to East Greenwich. That was the last anyone heard from Mulvaney.

In the early morning hours of January 13, Innis awakened a homeowner in Coventry to ask for directions to Weaver Hill Road and requested that a cab be called for him. The resident explained that no cabs were available at that hour. He also testified that Innis was traveling on foot and that he was carrying a flashlight similar to one subsequently identified as having been owned by Mulvaney.

At about 4 a. m. that morning, Innis arrived at the Weaver Hill Road residence of his friend Crawford Calder. Innis told Calder that his car had broken down on Interstate Route 95 and asked to spend the rest of the night there. In the morning, Innis showed his friend the sawed-off shotgun and asked him to destroy the flashlight he had brought with him.[1] That morning, after a futile search for Innis's car, Calder gave him a ride to Providence.

Prior to leaving Coventry, Innis place a phone call to the Providence home of George Hull. The phone was answered by Priscilla Johnson, who testified that during the course of the conversation, Innis told her he had "to off that dude." When Hull came to the phone, Innis told him he had arrived in Coventry by cab but because the driver had given him some "trouble," he had "dumped him."

---

1. Calder attempted to destroy the flashlight by melting it but was unsuccessful. It was later entered into evidence.

On the morning of January 16, Silver Top Cab 21 was found abandoned in Coventry approximately one-quarter mile off Weaver Hill Road. The nude body of John Mulvaney was discovered in a shallow grave some eight hundred yards from the cab. A blue and white blanket was found some two hundred yards from the cab. Medical testimony revealed that Mulvaney had died as a result of a shotgun blast fired at close range at the back of his head.

Shortly after midnight on January 17, 1975, the Providence police received a phone call from Gerald Aubin, a cab driver, reporting that he had just been robbed.[2] While at the Providence police station, Aubin noticed a photograph of Innis on the wall and notified the police that Innis was his assailant. At 4:30 a. m. that same morning, a policeman observed Innis walking along the easterly side of Chalkstone Avenue and arrested him.

The trial justice denied the motion for judgment of acquittal in regard to the robbery count. General Laws 1956 (1969 Reenactment) § 11–39–1. Although robbery is a statutory offense in Rhode Island, the statute merely incorporates the common-law elements of the offense, that is, " 'the felonious taking of money or goods of any value from the person of another, or in his presence, against his will, by violence, or putting him in fear.' " *State v. Domanski*, 57 R.I. 500, 501, 190 A. 854, 855 (1937). *See also State v. Reposa*, 99 R.I. 147, 206 A.2d 213 (1965).

When considering a motion for judgment of acquittal, the trial justice is bound to review the evidence in the light most favorable to the state and to draw from it every reasonable inference that would support a conviction. *State v. Moretti*, 113 R.I. 213, 319 A.2d 342 (1974). Neither the credibility of witnesses nor the weight of the

evidence is before the court. *State v. Johnson*, 116 R.I. 449, 358 A.2d 370 (1976); *State v. Wilbur*, 115 R.I. 7, 339 A.2d 730 (1975).

Innis, in arguing that the trial justice erred in denying the motion, claims that because the evidence of his guilt on the robbery count is entirely circumstantial,[3] the trial justice should have allowed the motion because the state was unable to exclude every reasonable hypothesis of innocence. *See State v. Montella*, 88 R.I. 469, 476–77, 149 A.2d 919, 922–23 (1959). Thus, under the so-called *Montella* rule, when the evidence presented is entirely circumstantial, the evidence must not only be consistent with guilt but must also be inconsistent with any reasonable hypothesis of innocence. *State v. Murphy*, 113 R.I. 565, 584, 323 A.2d 561, 565 (1974). We are compelled to emphasize that *Montella* did not require the jury or the trial justice to recognize any speculative theory of innocence and elevate it to a reasonable hypothesis of innocence. *State v. Jefferson*, 116 R.I. 124, 129, 353 A.2d 190, 194 (1976).

Because we no longer draw a distinction between direct and circumstantial evidence, we abandoned the *Montella* rule insofar as it applies to jury instructions. *State v. Roddy*, R.I., 401 A.2d 23 (1979). In *State v. Proulx*, R.I., 419 A.2d 835, 841 n.4 (1980), we specifically stated that "[w]e intended to abandon the 'Montella' rule and all remaining vestiges of the distinction between circumstantial and direct evidence. * * * Rather this court shall review the sufficiency of all evidence—circumstantial as well as direct—by reference to the sole standard that it must sustain a finding of guilt beyond reasonable doubt." We shall, however, apply the *Montella* standard in this case if the evidence so warrants because Innis was tried and convicted prior to our

---

**2.** The cab driver's testimony was excluded from the jury as prejudicial "other crimes" evidence.

**3.** In this jurisdiction, it is well settled that there is no distinction between the probative force of direct evidence and that of circumstantial evidence. *State v. Auregemma*, 116 R.I. 425, 436, 358 A.2d 46, 52 (1976); *State v. Rose*, 112 R.I.

402, 407, 311 A.2d 281, 284 (1973); *see also Holland v. United States*, 348 U.S. 121, 139–40, 75 S.Ct. 127, 137–38, 99 L.Ed. 150, 166–67 (1954); *State v. Cowperthwaite*, 354 A.2d 173 (Me.1976); *State v. Ray*, 43 N.J. 19, 202 A.2d 425 (1964); *State v. Rockwell*, 86 Wash.2d 393, 544 P.2d 1250 (1976).

ruling in *Roddy. Id.; see State v. Sundel*, R.I., 402 A.2d 585, 590 n.4 (1979).

In examining the evidence presented by the state, certain facts seem clear: (1) at the time Innis entered the cab, he had in his possession a shotgun; (2) Mulvaney should have had in his possession approximately $20 in fares collected prior to the time he picked up Innis; (3) only $2 was found in the cab; (4) the body of Mulvaney was nude when discovered, and the clothes were never found;[4] (5) Mulvaney ordinarily carried a flashlight with him similar to the one Innis gave to Calder and asked him to destroy; (6) the cab was found near the Calder residence; (7) Innis made incriminating admissions to Hull and Johnson. These facts strongly suggest that Innis removed items of value from Mulvaney's person with an intent to deprive him of them permanently.

However, Innis claims that even if the only reasonable theory that could be adduced from such evidence suggests that he was responsible for the removal of the money, the clothing, and the flashlight, acquittal should have been granted because the state failed to prove a critical element of the crime—the taking of items by violence or the putting of the victim in fear.

Even though we are not unmindful of the fact that the general rule about the taking of goods of value from an unconscious person is larceny, not robbery, we note that this rule is inapplicable when death or a comatose state is caused in order to facilitate the taking. 2 Wharton, *Criminal Law and Procedure* § 556 at 259 (12th ed. 1957). *See also Hicks v. State*, 232 Ga. 393, 207 S.E.2d 30 (1974); *State v. Cottone*, 52 N.J. Super. 316, 145 A.2d 509 (1958); *Smith v. State*, 519 P.2d 1370 (Okl.Crim.1974); *State v. Stecker*, 79 S.D. 79, 108 N.W.2d 47 (1961).

In the case at bar, the evidence does not lend itself to the suggestion that the death of Mulvaney was motivated for some reason other than robbery.[5] There is absolutely no evidence to suggest that the robbery was merely an afterthought of the killing. *Cf. People v. Pack*, 34 Ill.App.3d 894, 899, 341 N.E.2d 4, 8 (1976) (taking of property only an afterthought of the killing). Although we agree with Innis that it seems ludicrous to kill a person over a flashlight or $20, we note that motive is not an element to be proved by the state. *State v. Brown*, 96 R.I. 236, 190 A.2d 725 (1963). Any evidence that would suggest that the cause of death was not directly linked to the robbery is purely speculative and in no way rises to the level of a reasonable inference. Consequently, we do not believe that the trial justice erred in denying the motion for judgment of acquittal on the robbery charge.

Innis next contends that the trial justice was in error for failing to instruct the jury that it might return a verdict of murder in the second degree or of manslaughter. The trial justice declined to give this charge and gave only a felony-murder and simple first-degree-murder charge to the jury.

■ This court has long followed the rule that instructions should not be given on lesser degrees of murder or manslaughter absent some evidence to support such a verdict. *State v. Cline*, R.I., 405 A.2d 1192 (1979); *State v. Infantolino*, 116 R.I. 303, 355 A.2d 722 (1976). In *Infantolino* we stated:

> "A charge to the jury should be confined to propositions of law related to material issues of fact which the evidence tends to support. The jury's attention should not be directed to various propositions of law unless the record contains evidence which supports and requires it." *Id.* at 307, 355 A.2d at 724–25.

---

**4.** Medical testimony indicated that Mulvaney was partially unclothed when he walked through the woods. Given that this event occurred in the middle of the winter, we find it difficult to believe that Mulvaney would voluntarily remove his pants prior to a walk in the woods.

**5.** The record is devoid of any indication that Innis had ever met Mulvaney prior to the evening of January 12 or that his death was in any way the result of some type of sexual assault as Innis seems to imply on this appeal.

■ In this case, no evidence was presented which would suggest that the killing would fall within the parameters required by second-degree murder or manslaughter. There was no evidence of a fight; the shotgun was fired to the back of the head at close range, which would suggest an execution type of killing rather than one done in the heat of passion. The trial justice charged the jury on the only type of homicide which would be supported by the evidence.[6]

Innis also charges the trial justice erred by failing to allow the motion to suppress the shotgun and verbal admissions made to the police while he was in custody. Specifically, he alleges that under *State v. Travis*, 116 R.I. 678, 360 A.2d 548 (1976), the action by the police officers amounted to an inducement to speak and as such was tantamount to further interrogation in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966),[7] as well as art. I, sec. 13, of the Rhode Island Constitution. Innis asks that we do what we did in *Travis* and fault the police on the basis of our State Constitution.

*State v. Travis*, 116 R.I. 678, 360 A.2d 548 (1976), involved a situation in which a prisoner charged with robbery, after indicating that he wanted to consult an attorney, was placed in a cell. Shortly thereafter, an undercover police officer masquerading as a prisoner entered the cell and engaged in a conversation with Travis. During the course of this conversation, Travis made several statements that amounted to a confession. In overruling the trial justice's decision denying the motion to suppress, we held that the mere presence of the police officer in the cell was "an inducement to speak." *Id.* at 683, 360 A.2d at 551. We stressed that the problem of whether or not the officer directly questioned Travis was not the dispositive issue.

"To allow into evidence admissions made to an agent in the cell who made casual conversation with a defendant while carefully avoiding any questions regarding the specific crime under investigation, but to disallow that agent's testimony if he asked a question pertaining to a defendant's reason for being incarcerated, would be to play games with an individual's constitutional guarantees. This we will not do." *Id.* at 682–83, 360 A.2d at 551.

The officer was placed in the cell specifically for the purpose of obtaining information from Travis regarding the robbery.

■ However, the record in the instant case bears little resemblance to that of *Travis*. Here, there is no question that Innis received and understood his *Miranda* rights. *Cf. State v. Vargus*, R.I., 373 A.2d 150 (1977) (record devoid of indication that defendant acknowledged affirmatively his understanding of the *Miranda* rights). Although defendant was in custody, that status alone does not automatically make every statement made without the presence of an attorney inadmissible. There must be some action by the police amounting to interrogation after an accused or a suspect evidences a desire to see his attorney and refuses to answer further questions. *See Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *State v. Gelinas*, R.I., 417 A.2d 1381 (1980). Absent evidence of an attempt by the police to induce a statement from a prisoner, such statements must be deemed voluntary.

We are unable to agree that the conversation that occurred while on the way to police headquarters was designed to elicit from Innis statements regarding the crimes under investigation. Although we have no trouble agreeing that such admissions were prompted by the remarks made by Officer

---

6. In view of the foregoing discussion, we do not believe that the trial justice erred in submitting the case to the jury on a felony murder theory. Moreover, we cannot agree with Innis that his motion for a new trial, based on the grounds that the verdict was against the weight of the evidence, was improperly denied by the trial justice.

7. This portion of his argument was examined and rejected by the Supreme Court in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

Joseph Gleckman,[8] we are unable to agree that they were made to induce Innis to speak. For this reason, we will not fault the trial justice's denial of Innis's motion to suppress.

Innis also maintains that the trial justice improperly refused to grant a motion for acquittal on the kidnapping count. General Laws 1956 (1969 Reenactment) § 11–26–1. Innis contends that the kidnapping statute cannot properly be applied to detentions that are incidental to the commission of another crime, in this instance robbery, because such application would extend the reach of the statute far beyond the traditional notion of kidnapping. Since this court has never considered the state's kidnapping statute, it is fitting that we first examine the development of the law relating to kidnapping.

Kidnapping, a common-law misdemeanor, was traditionally defined as "the forcible abduction or stealing away of a man, woman, or child, from their own country and sending them into another." 4 Blackstone, *Commentaries on the Laws of England* *219 (2 Sharswood ed. 1860). The notion that the victim must be carried beyond certain established boundaries retained its vitality during the early statutory development of the offense in this country.

General Laws 1896, ch. 277, § 21, provided for a one-to-ten-year prison sentence for any person "who shall transport or carry or cause to be transported or carried by land or. water any citizen of this state or any other person lawfully residing or inhabiting herein to any place without the limits of this state without his consent or voluntary agreement * * *." Subsequently, in 1915, with the passage of P.L. 1915, ch. 1258, § 8, the General Assembly amended the kidnapping statute by adding a proviso that called for the imposition of a prison sentence of up to ten years or a $1,000 fine against any person

> "who willfully leads, takes, entices away, or detains a child under the age of eighteen years, with intent to keep or conceal it from the person or persons having the lawful care or control hereof, or to extort or obtain money or reward for the return or disposition of such child * * * or who by force or fraud unlawfully takes or carries away any such child at or from a place without this state, and afterwards sends, brings, has or keeps such child, or causes it to be kept or secreted in this state * * *."

However, in the 1930s there emerged a trend among the state Legislatures, including Rhode Island's, to increase the penalty for the offense and to expand its scope by requiring only a detention rather than an asportation outside the jurisdiction. The General Assembly at its January 1932 session revised our kidnapping statute, and this revised version is now part of our General Laws and is to be found in G.L. 1956 (1969 Reenactment) chapter 26 of title 11. In essence, ch. 26 provides that anyone who secretly or forcibly confines or imprisons another against his will within this state or carries or sends another person out of the state or intends to do the same shall be subject to imprisonment for a term of up to

---

**8.** Innis was arrested in an area close to a school for handicapped children. Within minutes of his arrest, Innis was advised of his *Miranda* rights on three separate occasions: once, by the arresting officer; secondly, by a police sergeant; and subsequently, by a captain. After Innis had informed one and all that he understood his rights and desired the services of an attorney, the captain ordered that the suspect be placed in a police cruiser and taken to police headquarters. There were three officers in the cruiser; Officers Joseph Gleckman and Richard McKenna occupied the front seat while a third officer and Innis were the backseat passengers. Captain Leyden had told the trio that they were not to question Innis in any way as they proceeded to headquarters. As the cruiser proceeded to its destination, Gleckman expressed his concern to McKenna that one of the handicapped children might hurt himself or herself if he or she discovered the weapon and shells. At this point, Innis spoke up and told the officers to turn around so that he could show them "where the weapon is." The cruiser returned to the school area. Captain Leyden once again advised Innis of his *Miranda* rights. Innis acknowledged that he was aware of his rights but that he wanted to get the gun out of the way because of the school kids. Innis then walked into a nearby field, where he located the shotgun and some shells that had been secreted under a rock pile.

twenty years; and whoever commits any of the offenses mentioned within the chapter with intent to extort money or some other thing of value will be guilty of a felony and, on conviction, subject to a prison term from a maximum of life imprisonment to a minimum of five years' incarceration.

Initially, courts that examined these statutes placed their imprimatur of approval on the statutory declaration that any forcible movement, no matter how slight, constituted sufficient basis to support a kidnapping conviction. Preeminent among cases endorsing that point of view stands *People v. Chessman*, 38 Cal.2d 166, 238 P.2d 1001 (1951). In *Chessman*, the victim was moved only twenty-two feet before undergoing a sexual assault by the defendant. Nonetheless, the Supreme Court of California upheld the defendant's conviction under Cal. Penal Code § 209 (1933) and stated, "It is the fact, not the distance of forcible removal which constitutes kidnapping in this state." *Id.* at 192, 238 P.2d at 1017. *See also People v. Knowles*, 35 Cal.2d 175, 217 P.2d 1 (1950). Eight years later, the *Chessman* rule was reaffirmed in *People v. Wein*, 50 Cal.2d 383, 326 P.2d 457 (1958). There, the defendant forced his captives to move from room to room within their own house during the course of a robbery. In addressing a challenge to the harsh result caused by the rule, the court stated:

> "If the section, as interpreted by this court, is regarded as too harsh, the remedy is for the Legislature to redefine kidnapping, and not for this court to engraft some uncertain distance limitation onto the plain language of the section." *People v. Wein*, 50 Cal.2d at 400, 326 P.2d at 466.

California was not alone in supporting the view that the degree of asportation needed to commit a kidnapping offense could be minimal. In *People v. Florio*, 301 N.Y. 46, 92 N.E.2d 881, 100 N.Y.S.2d 46 (1950), the New York Court of Appeals

reiterated its view that under the applicable statute[9] any confinement or movement constituted a kidnapping even if such movement was undertaken only to facilitate another crime. In *Florio*, the defendant drove the victim from Manhattan to an isolated part of Queens and raped her. Although the court acknowledged that the "detention inevitably occurring during the immediate act of commission of such a crime as rape or robbery would not form a basis for a separate crime of kidnapping," it held that the events occurring in the case constituted kidnapping both under the statute and in the popular understanding of the act. *People v. Florio*, 301 N.Y. at 49, 92 N.E.2d at 882, 100 N.Y.S.2d at 49. *See also People v. Small*, 274 N.Y. 551, 10 N.E.2d 546 (1937); *People v. Hope*, 257 N.Y. 147, 177 N.E. 402 (1931).

However, in 1965 the Court of Appeals reexamined the *Florio* definition and concluded that the definition was overbroad. In *People v. Levy*, 15 N.Y.2d 159, 204 N.E.2d 842, 256 N.Y.S.2d 793 (1965), a case in which the victim was driven twenty-seven blocks during the course of robbery, the court expressly overruled *Florio* and limited the application of the kidnapping statute to kidnapping in the "conventional sense." *Id.* at 165, 204 N.E.2d at 844, 256 N.Y.S.2d at 796. The court suggested that the basic concept behind the crime of kidnapping envisages the asportation of a person under restraint and compulsion. "Usually the complete control of the person and the secrecy of his location are means of facilitating extortion." *Id.* at 164, 204 N.E.2d at 843–44, 256 N.Y.S.2d at 795. The court distinguished this situation from those restraints which are "incidents to other crimes and have long been treated as integral parts of other crimes * * *." For example, the court suggested that a broad construction of the New York statute could lead to a kidnapping conviction as a result

---

9. Penal Law ch. 40 § 1250(1) provided in pertinent part:

"A person who wilfully: 1. Seizes, confines, inveigles, or kidnaps another, with intent to cause harm, without authority of law, to be confined or imprisoned within this state * * or in any way held to service or kept, or detained against his will * * * [i]s guilty of kidnapping."

of a robbery where the victim was "confined briefly at gunpoint or bound and detained, or moved into and left in another room or place." The court suggested that this result was not intended by the Legislature "even though kidnapping might sometimes be spelled out literally from the statutory words." *Id.* at 164, 204 N.E.2d at 844, 256 N.Y.S.2d at 796.

Two years later, the Court of Appeals elaborated on this theme. In *People v. Lombardi*, 20 N.Y.2d 266, 229 N.E.2d 206, 282 N.Y.S.2d 519 (1967), the court reaffirmed *Levy* and suggested that the kidnapping statute should be applied only to those situations in which the asportation of the victim is an integral part of the crime. The court stated:

> "[T]he direction of the criminal law has been to limit the scope of the kidnapping statute * * * to true kidnapping situations and not to apply it to crimes which are essentially robbery, rape or assault and in which some confinement or asportation occurs as a subsidiary incident." *Id.* at 270, 229 N.E.2d at 208, 282 N.Y.S.2d at 521.

*See also People v. Miles*, 23 N.Y.2d 527, 245 N.E.2d 688, 297 N.Y.S.2d 913 (1969).

The California Supreme Court reconsidered its position regarding the degree of asportation needed to sustain a kidnapping conviction in *People v. Daniels*, 71 Cal.2d 1119, 459 P.2d 225, 80 Cal.Rptr. 897 (1969). In reversing a kidnapping conviction, the Supreme Court stated, "[M]ovements of the victim [which] are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself" are outside the scope of the kidnapping statute.[10] *Id.* at 1139, 459 P.2d at 238, 80 Cal.Rptr. at 910.

*See generally* Note: *Room-to-room movement: A Risk Rationale for Aggravated Kidnapping*, 11 Stan.L.Rev. 554 (1959). Later, in *People v. Timmons*, 4 Cal.3d 411, 482 P.2d 648, 93 Cal.Rptr. 736 (1971), the court, in vacating a kidnapping conviction in which the victim had been driven five blocks during the course of a robbery, stated:

> "The true test in each case is not mere mileage but whether the movements of the victim *'substantially* increase the risk of harm' beyond that inherent in the crime of robbery itself." (Emphasis in original.) *Id.* at 415, 482 P.2d at 651, 93 Cal.Rptr. at 739. *See also People v. Mutch*, 4 Cal.3d 389, 482 P.2d 633, 93 Cal.Rptr. 721 (1971).

In *People v. Adams*, 389 Mich. 222, 205 N.W.2d 415 (1973), the Michigan Supreme Court interpreted a statute virtually identical to G.L. 1956 (1969 Reenactment) § 11-26-1. The court determined that the sweep of the statute was so broad that in order to render it constitutional, the court would have to read into it "the historical concept of asportation." *Id.* at 230, 205 N.W.2d at 419. After reviewing the historical development of kidnapping statutes, the court adopted a modified *Daniels* test to establish kidnapping, saying "that the confinement and asportation are not merely incidental to the lesser underlying crime." *Id.* at 235–36, 205 N.W.2d at 421. The court specifically rejected the "added danger" element set forth in *Daniels*: "[t]here could be asportation without this element of additional danger so long as the movement was incidental to a kidnapping and not a lesser crime." *Id.* at 238, 205 N.W.2d at 423.

However, the *Daniels* test, and variations thereof, has its critics.[11] In *State v. Buggs*, 219 Kan. 203, 547 P.2d 720 (1976), the Su-

---

10. This two-prong test has been applied by the court a number of times since *People v. Daniels*, 71 Cal.2d 1119, 459 P.2d 225, 80 Cal.Rptr. 897 (1969), but with differing results. *See, e. g., In re Earley*, 14 Cal.3d 122, 534 P.2d 721, 120 Cal.Rptr. 881 (1975); *People v. Lara*, 12 Cal.3d 903, 528 P.2d 365, 117 Cal.Rptr. 549 (1974); *People v. Stanworth*, 11 Cal.3d 588, 522 P.2d 1058, 114 Cal.Rptr. 250 (1974).

11. The various views that have been expressed when one court or the other was determining whether there was a kidnapping may be found in "Seizure or Detention for Purpose of Committing Rape, Robbery, or Similar Offense as Constituting Separate Crime of Kidnapping," 43 A.L.R.3d 699 (1972), together with its August 1980 supplement.

preme Court of Kansas specifically rejected the "additional element of danger" test in favor of a modified version of the incidental-movement test. The court stated,

> "Under our statute a taking is a kidnapping if its purpose *is* to 'facilitate' the commission of any crime, even if the crime facilitated be a less serious crime such as robbery or rape. * * * We agree * * * that a kidnapping statute is not reasonably intended to cover movements and confinements which are slight and 'merely incidental' to the commission of an underlying lesser crime." (Emphasis in original.) *Id.* at 214–15, 547 P.2d at 730.

*See also State v. Brown,* 181 Kan. 375, 312 P.2d 832 (1957). Hence, the court drew a distinction between confinement that was "merely incidental" to another crime and confinement that "facilitated" the commission of that crime.

■ We would prefer to avoid such semantic distinctions. The history of our statute and the experience of other jurisdictions suggest that conduct that was traditionally considered to be an integral element of another crime cannot be punished as kidnapping. We endorse the view expressed in *Levy* that the kidnapping statute should only be applied to "conventional" kidnappings. To apply the wording of the statute in a literal manner would run the risk of kidnapping convictions based on trivial changes in location having "no bearing on the evil at hand." *See* Model Penal Code § 212.9 Comment (Tent. Draft No. 11, p. 14, 1960). Therefore, we hold that confinements that are incidental to the commission of a crime are not punishable under § 11–26–1. In order to come within the scope of that section, a confinement or imprisonment must have some independent significance. Thus, any movement of a victim during the course of a crime cannot be punished as a kidnapping unless such movement exceeds that necessary to facilitate the crime at hand. *See People v. Canale,* 52 Ill.2d 107, 285 N.E.2d 133 (1972); *People v. Levy,* 15 N.Y.2d 159, 204 N.E.2d 842, 256 N.Y.S.2d 793 (1965); *Commonwealth v. Hughes,* 264 Pa.Super. 118, 399 A.2d 694 (1979).

■ In applying this standard to the case at bar, it seems apparent that the confinement and asportation of the cab driver had no significance independent of the robbery and murder. Therefore, the trial justice erred by failing to grant the motion for acquittal as it related to the kidnapping count.

In summarizing the events that have occurred since Innis's appeal was first docketed here, it is obvious that although there was ample evidence to support the robbery count, the conviction cannot stand in light of what was said in *Innis* No. 1 about double jeopardy and convictions that are based upon robbery and killing that occurred during the commission of a felony, to wit, robbery. We are firmly convinced that the jury's guilty verdict in regard to the robbery count amounts to a special finding that Mulvaney met his death during the course of the robbery. Thus, the first-degree-murder conviction will remain undisturbed, but the robbery conviction must be vacated.

The defendant's appeal is sustained in part and denied in part, the judgment of conviction entered relative to the murder count is affirmed, the judgments of conviction entered relative to the robbery and kidnapping counts are vacated, and the case is remanded to the Superior Court.

SHEA, J., did not participate.

BEVILACQUA, Chief Justice, concurring in part and dissenting in part.

Although I concur with the decision of the majority to vacate the convictions for robbery and for kidnapping, I must respectfully dissent from the majority view on the question of whether the defendant was interrogated in violation of art. I, sec. 13 of the Rhode Island Constitution. The position that the majority adopts today effectively allows the police officers in an interrogation environment to accomplish indirectly what they may not accomplish directly. *See State v. Travis,* 116 R.I. 678, 683,

360 A.2d 548, 551 (1976). Even though I recognize that the dividing line between statements volunteered by a suspect and statements impermissibly elicited from a suspect after he has asserted his constitutional rights or requested an attorney is not always clear, I believe that the facts and circumstances of the instant case indicate that the statements elicited from the defendant after his exercise of his right to counsel and the evidence obtained therefrom were admitted into evidence in violation of both defendant's federal and his state constitutional rights.

The resolution of federal constitutional law is controlled by decisions of the United States Supreme Court. *Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570, 576 (1975). But a state is free, in interpreting its own laws or constitution, to impose greater restrictions to protect its citizens against governmental intrusions, even if the state and federal provisions are similar. *See id.* at 719, 95 S.Ct. at 1219, 43 L.Ed.2d at 576; *State v. Benoit*, R.I., 417 A.2d 895, 899 (1980). The decision to depart from the minimum standards guaranteed by the Federal Constitution and to afford greater protection to the citizens of this state, should be made guardedly and be supported by a principled rationale.[1] *State v. Benoit* R.I., 417 A.2d at 899; *cf. State v. Maloof*, 114 R.I. 380, 389, 333 A.2d 676, 681 (1975) (in search-and-seizure area, state is free to adopt higher standard than that compelled by Federal Constitution). *See generally* Howard, *State Courts and Constitutional Rights in the Day of the Burger Court*, 62 Va.L.Rev. 873 (1976).

Although the textual language of the Fifth Amendment and that of R.I.Const. art. I, sec. 13 is similar, in the instant case I believe that the rule of *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) does not reflect our fundamental principle concerning interrogation under either our own constitution or our case law. In *State v. Travis*, 116 R.I. 678, 360 A.2d 548 (1976), where a defendant in custody was afforded his *Miranda* rights and invoked the right to remain silent and to consult with a lawyer, we held that "[t]he mere presence of [the undercover police officer] was an inducement to speak" and that "[t]he undercover agent's ruse amounted to proscribed 'further interrogation'" that effectively "nullified defendant's privilege against compelled self-incrimination as guaranteed by the Constitution of Rhode Island, art. 1, § 13." *State v. Travis*, 116 R.I. at 683, 366 A.2d at 551; *see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *State v. Lachapelle*, 112 R.I. 105, 308 A.2d 469 (1973). Hence, in determining whether the defendant had been impermissibly induced to speak, we focused solely on the police conduct.

Similarly, in *State v. Innis*, R.I., 391 A.2d 1158 (1978), we applied the same standard in finding that the conversation[2] carried on between Officers Gleckman and McKenna within earshot of defendant constituted inducement sufficient for us to conclude that defendant had been impermissibly interro-

---

1. The United States Supreme Court itself has noted that
   "It is impossible for us to foresee the potential alternatives for protecting the [Fifth Amendment privilege against self-incrimination] which might be devised by Congress or the States in the exercise of their creative rule-making capacities. Therefore we cannot say that the Constitution necessarily requires adherence to any particular solution for the inherent compulsions of the interrogation process as it is presently conducted. Our decision in no way creates a constitutional straitjacket which will handicap sound efforts at reform, nor is it intended to have this effect. We encourage Congress and the States to continue their laudable search for

increasingly effective ways of protecting the rights of the individual while promoting efficient enforcement of our criminal laws." *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694, 719–20 (1966).

2. En route to the police station, Officer Gleckman remarked to Officer McKenna in Innis's presence that "there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves." Officer McKenna reportedly responded, "Gee, it would be too bad." At this point, defendant reportedly said, "Stop, turn around, I'll show you where it is."

gated. *Id.*, 391 A.2d at 1162 (Kelleher, J., with whom Joslin, J., joined, dissenting). On appeal, however, the United States Supreme Court in *Rhode Island v. Innis* ruled that the term "interrogation * * * refers not only to express questioning, but also to any words or actions on the part of the police * * * that [they] should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 301, 100 S.Ct. at 1689, 64 L.Ed.2d at 308. (Footnotes omitted.) Accordingly, in applying their own standard, the Court determined that defendant "was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him." *Id.* at 303, 100 S.Ct. at 1691, 64 L.Ed.2d at 309. In construing art. I, sec. 13 of our Rhode Island Constitution and our own case law, I would respectfully disagree with this conclusion.

In the instant case, the three officers who accompanied defendant to the station house were directed by their superior not to question defendant en route. Notwithstanding this admonition, the accompanying officers deliberately began discussing among themselves, in defendant's presence, specific emotional aspects of the very crime under investigation. Contrary to the state's contention, the colloquy between Officers Gleckman and McKenna was no idle conversation to pass the time of day nor should their conversation be so cavalierly dismissed as "no more than a few off-hand remarks." *Rhode Island v. Innis*, 446 U.S. at 303, 100 S.Ct. at 1691, 64 L.Ed.2d at 309. Rather, defendant was prompted to believe that his assistance in locating the shotgun and shells would prevent untold harm to some unsuspecting handicapped child. Indeed, "[o]ne can scarcely imagine a stronger appeal to the conscience of a suspect—any suspect— than the assertion that if the weapon is not found an innocent person will be hurt or killed. And not just any innocent person, but an innocent child—a little girl—a helpless, handicapped little girl on her way to school. The notion that such an appeal could not be expected to have any effect unless the suspect were known to have some special interest in handicapped children verges on the ludicrous." *Id.* at 306, 100 S.Ct. at 1692, 64 L.Ed.2d at 311 (Marshall, J., with whom Brennan, J., joined dissenting).[3]

I note also that the majority in the instant case agrees that defendant's statements "were prompted by the remarks made by Officer Joseph Gleckman," yet they "are unable to agree that they were made as an inducement for [defendant] to speak." I perceive no real difference between a defendant's being "prompted" or his being "induced" to make incriminating statements.[4] In my view, both prompting and inducing someone to incriminate himself after he has invoked his constitutional rights constitute improper interrogation under both the Fifth Amendment and the Constitution of Rhode Island, art. I, sec. 13. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *State v. Travis*, 116 R.I. 678, 366 A.2d 548 (1976); *State v. Lachapelle*, 112 R.I. 105, 308 A.2d 467 (1973).

I fear that the test for interrogation as applied by the Court in *Rhode Island v. Innis* and adopted by the majority today may very well create "an incentive for police to ignore a suspect's invocation of his

3. Although the Court stated that "the perceptions of the suspect, rather than the intent of the police" would be the focus in determining whether there has been an interrogation, they nevertheless focused exclusively on how the police officers perceived defendant. *Rhode Island v. Innis*, 446 U.S. at 302–03, 100 S.Ct. at 1690–91, 64 L.Ed.2d at 308–09. In this regard, I agree with Justice Stevens, who chided the majority for failing to abide by its promise to evaluate police statements from the suspect's point of view: "By prohibiting only those rela-

tively few statements or actions that a police officer should know are likely to elicit an incriminating response, the Court * * * accords a suspect considerably less protection." *Id.* at 311–12, 100 S.Ct. at 1695, 64 L.Ed.2d at 314 (Stevens, J., dissenting).

4. According to *Webster's Third New International Dictionary* 1154, 1815 (1971) to "induce" is "to inspire, call forth, or bring about by influence or stimulation" while "prompt" means "to move to action, incite."

rights in order to make continued attempts to extract information from him." *Rhode Island v. Innis*, 446 U.S. at 313, 100 S.Ct. at 1696, 64 L.Ed.2d at 315–16 (Stevens, J., dissenting). Additionally, I fear that the risk that will result from adoption of the majority viewpoint lies in the fact that "the police are apparently free to exert that pressure on [defendant] despite his request for counsel, so long as they are careful not to punctuate their statements with question marks." *Id.* It may appear to some that such "prompting" of a defendant in an interrogation environment is an "obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. * * It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." *Boyd v. United States*, 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746, 752 (1886).

Consequently, as a matter of Rhode Island law, I would adopt Justice Stevens's view that "any statement that would normally be understood by the average listener as calling for a response is the functional equivalent of a direct question, whether or not it is punctuated by a question mark." *Rhode Island v. Innis*, 446 U.S. at 309, 100 S.Ct. at 1694, 64 L.Ed.2d at 313 (Stevens, J., dissenting). In my view not only is this definition a more workable one,[5] but it is also a more accurate reflection of Rhode Island law concerning interrogation.

---

5. Even Chief Justice Burger, in his concurring opinion in *Rhode Island v. Innis*, expresses a concern that the majority opinion "may introduce new elements of uncertainty; under the Court's test, a police officer in the brief time available, apparently must evaluate the suggestibility and susceptibility of an accused." *Rhode Island v. Innis*, 446 U.S. at 304, 100 S.Ct. at 1691, 64 L.Ed.2d at 310 (Burger, C. J., concurring). Additionally, the recent case of *Edwards v. Arizona*, —— U.S. ——, 101 S.Ct.

1880, 68 L.Ed.2d 378 (1981), indicates that the Court is not in agreement regarding the requisite elements of "interrogation." For example, it is unclear whether a determination of interrogation now involves a two-part test: (1) was there in fact "interrogation" under *Rhode Island v. Innis*, and (2) did the police "initiate" it. *See id.* at ——, 101 S.Ct. at 1881, 68 L.Ed.2d at 389–90 (Powell, J., with whom Rehnquist, J., joined, concurring in the result).